CHAS. H. LILLY CO. et al. v. I. F. LAUCKS, Inc.

No. 7083.

Circuit Court of Appeals, Ninth Circuit.

Dec. 21, 1933.

176

See, also, 68 F.(2d) 190.

Jay C. Allen and Weldon G. Bettens, both of Seattle, Wash., for appellants Lilly and Chas. H. Lilly Co.

G. Wright Arnold, Raymond D. Ogden, Clinton L. Mathis, and Ward W. Roney, all of Seattle, Wash., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

On March 27, 1928, appellee filed in the District Court its "Bill of Complaint for Injunction and Accounting of Profits and Damages for Infringement of Reissued Patent No. 16,422 (Originally 1,460,757)," naming as defendants the Chas. H. Lilly Company and Wilmot H. Lilly, its president, as contributory infringers of the patent, and Kaseno Products Company and George F. Linquist, its president, as direct infringers. From a decree in favor of plaintiff-appellee, upholding the validity of the patent and the charge of contributory infringement, the Chas. H. Lilly Company (hereinafter referred to as appellant Lilly Company) and Wilmot H. Lilly (hereinafter referred to as appellant Lilly) have prosecuted this appeal. Kaseno Products Company and George F. Linquist joined in the citation on appeal, but thereafter withdrew and waived the assignments of error filed by them and abandoned their right of appeal, and as to those defendants the decree is final.

Appellee is the owner of the Letters Patent described in its bill (referred to herein as the Johnson patent) by virtue of an assignment thereof, on June 30, 1925, from Otis Johnson, to whom the patent was originally issued on July 3, 1923, as Letters Patent 1,-460,757.

The invention of the Johnson patent, as stated therein, "relates to an adhesive formula and the product produced therefrom." The specifications of the patent are as follows:

"I have discovered from experiments that a high class waterproof adhesive, such as so-called glue, may be realized from soya beans, or rather the residue derived from soya beans preferably after the oily content of the beans has been extracted. This residue, I have found, contains a highly valuable adhesive constituent which provides an excellent base for an adhesive formula. One feature of the same resides in the fact that I can use either the residue as a whole, or else to realize a high grade product, I can extract by any suitable means the adhesive constituent of the residue.

"In carrying out the invention, soya beans are first pressed, or otherwise treated, to extract their oily content and the resultant pressed cake is either finely ground, when the whole of the residue is to be used, or else it is treated to extract the adhesive constituent when the high grade adhesive is to be produced. This adhesive constituent, or even the finely ground pressed cake, may be considered as a base for my formula and the same, on account of its adhesive qualities, I will term a tacky substance. I compound the tacky substance with various other agents which may be those commonly used in the manufacture of adhesives, such as hydrated lime and sodium fluoride, the tacky substance and the two agents named being mixed in solution. I, of course, do not confine myself to hydrated lime and sodium fluoride, as any other agents having substantially the same characteristic qualities will be sufficient. In fact, entirely different agents may be used, but I have not as yet experimented further than the agents of this character. The hydrated lime is, of course, a waterproofing solvent, and the sodium fluoride is a so-called liquefying agent; in other words, it prevents the compound from drying out. I have found that the following proportions give satisfactory results: About two and one-half to three parts hydrated lime, one part sodium fluoride, about ten parts of the tacky substance, and sufficient water to make up a solution of the desired consistency.

"The term adhesive, or glue, should not be construed in either the specification or claims as limited to the ordinary accepted meaning of the term, as this tacky substance may be used to advantage in calcimine formulas and other instances where a strong adhesive is not necessarily required.

"I have found in practice that by using this tacky substance I can produce a very cheap adhesive, and one that is far better than any that has been made by heretofore known formulas. Soya beans, or rather the

residue may be obtained at a very nominal cost and the treatment necessary to either grind the residue when it is used as a whole, or when it is treated to extract the adhesive constituent, is very simple. Consequently the base for the formula is realized without expensive equipment or other high cost.

"The so-called tacky substance, it shall be understood, only becomes tacky when mixed with water or a suitable solution. It shall be understood that the tacky substance which constitutes the adhesive constituent, after being finely ground, is in the form of dry meal. After this meal is produced, same is then mixed with hydrated lime and sodium fluoride. Therefore, the protein-containing vegetable material, otherwise called tacky substance, only becomes tacky when mixed with liquid, as aforesaid.

"I claim:

"1. An adhesive composition comprising the tacky substance of the soya bean, and an alkali-metal liquefying agent.

"2. An adhesive composition comprising the tacky substance of the soya bean, an alkali-metal liquefying agent, and a waterproofing agent.

"3. An adhesive composition comprising the tacky substance of the soya bean, hydrated lime, and sodium fluoride.

"4. The method of making an adhesive composition which consists in including therein the tacky substance of the soya bean.

"5. The process of making an adhesive composition which consists in extracting the oil from the soya bean, and adding to the residue an alkali-metal liquefying agent.

"6. The process of making an adhesive composition which consists in extracting the oil from the soya bean, and adding to the residue an alkali-metal liquefying agent and a waterproofing agent.

"7. The process of making an adhesive composition which consists in extracting the oil from the soya bean, grinding the residue, and then adding to the finely ground residue, hydrated lime and sodium fluoride.

"8. In a method of making glue, the steps which consist in treating protein-containing vegetable material derived from the soya bean with an alkali metal compound, and lime."

The bill alleged "that plaintiff has manufactured, sold and caused to be used great quantities of adhesive embodying and containing said patented invention, and the same has been purchased and used by the public and generally and extensively recognized by the public as of great utility and novelty, and plaintiff has built up a profitable and valuable business in the manufacture and sale thereof; that upon or to each of the containers or sacks in which the said manufactured material was vended by the plaintiff since the date of the grant and delivery of said Letters Patent and the assignment thereof, there has been marked in plain and conspicuous letters the word 'Patented' "; "that defendants have been notified in writing or had knowledge of the grant, issuance and delivery of said Letters Patent and warned not to infringe thereon or to manufacture, sell or use adhesive embodying or containing said patented invention, and said plaintiff had caused to be published in The Timberman, an international lumber journal published in Portland, Oregon, under date of issue September 7, 1925, a notice to the effect that it, the plaintiff, owned patents giving it the exclusive right to the manufacture of an adhesive embodying its patented invention; that notwithstanding said notice and said knowledge said defendants have jointly and severally infringed upon said patents"; that said defendants Kaseno Products Company and Chas. H. Lilly Company have jointly and severally contributed to said infringement by making and selling said infringing adhesive; that said defendant Kaseno Products Company has made and sold adhesive embodying said patented invention, and said defendant Chas. H. Lilly Company has contributed to said infringement by selling to said Kaseno Products Company soya bean material adapted and intended to be employed as a substantial part of the combination invented and patented, "well knowing that said material was to be thus used to manufacture said infringing adhesive and fully intending that it should be so used"; "that said defendants have conspired together to infringe upon said patent rights, and each and all of them refuse to desist therefrom, and intend, unless prohibited by this court, to continue to infringe said Letters Patent" by manufacturing and selling adhesive embodying said invention.

In the amended answer of Kaseno Products Company and George F. Linquist, filed February 28, 1930, it is denied that they had committed, or were committing, any wrongful or infringing acts, and denied that they had jointly or severally infringed the patent; denied that they had made or sold an infringing adhesive or an adhesive embodying the patent invention; admitted that they bought soya bean meal in its regular form from appellant Lilly Company, but denied any con-

spiracy between the defendants. The answer put in issue the validity of the patent, and denied that said defendants had done any act or thing, or proposed doing any act or thing, in violation of any alleged right, or otherwise, belonging to appellee or secured by the patent.

In the amended answer of appellant Lilly Company and appellant Lilly, filed March 20, 1930, they denied that they had committed any infringing acts and denied that they had been notified or had any knowledge of the issuance of the patent, or had been warned not to infringe; denied that they had contributed to the infringement by Kaseno Products Company by selling soya bean meal adapted and intended to be employed as a part of the patented combination; denied that they knew that the material furnished was to be used to manufacture an infringing adhesive or that they intended it to be so used, or that there was any conspiracy between the defendants. The answer admitted that Kaseno Products Company had purchased from appellant Lilly Company soya bean meal in the regular form in which said product was sold by appellant Lilly Company to the public generally.

As an affirmative defense, appellants alleged that the material sold by appellant Lilly Company to Kaseno Products Company was soya bean meal in the regular and standard form in which said material was sold to the trade in large quantities for divers uses and by a large number of manufacturers; that appellant Lilly Company and others engaged in like business had sold said material in like form for a long period of time and prior to the issuance of the patent; that said soya bean material, in the form and manner sold by appellant Lilly Company to Kaseno Products Company, was a standard article of commerce and had been such for a long period of time prior to the application for, or issuance of, the patent; that said material so furnished was furnished in response to orders given by Kaseno Products Company in the regular course of business, and was furnished without any recommendation or knowledge on the part of appellants as to its intended use, save only that it was to be used in the manufacture of some form of adhesive; that appellants had no control, interest, or part whatsoever in the manufacture of said adhesive, nor were appellants in any way familiar with the process employed by Kaseno Products Company in the manufacture of adhesives. Appellants denied that they had any connection or part whatever in the manufacture, sale, or use of any adhesive materials

except that they furnished said soya bean material in the ordinary course of business.

After a trial before the court, occupying sixty-four days, a decree was entered on July 11, 1932, adjudging claims 3 and 7 of the patent "to be good and valid in law" and infringed by Kaseno Products Company and George F. Linquist, and "contributorily infringed" by appellant Lilly Company and appellant Lilly.

Claims 5 and 8 of the patent were not in suit, and of the remaining claims the court, in its memorandum decision [59 F.(2d) 811, 815] said:

"The court will not undertake to determine the validity or scope of claims 1, 2, 4, and 6. The issues as to them, while possibly not moot, are so nearly so as to involve in their consideration somewhat the same danger as though they were. Where it is contended that a specific claim has been infringed, there is on the part of neither party to the litigation the same incentive to fully develop the subject of a general claim as there would be were not the specific claim alleged to be infringed. As before stated, claims 5 and 8 are not in suit."

The decree ordered that a writ of perpetual injunction issue enjoining the defendants from making, selling, using, or contributing to the making, selling, or using of glues embodying the invention of claims 3 and 7 of the patent, and enjoining defendants from conspiring to infringe said claims. The decree provided that plaintiff recover from the defendants the profits, gains, and benefits which the defendants had jointly or severally derived, and awarded plaintiff recovery against the defendants jointly and severally for all damages which it had sustained by reason of the infringing acts, as well as costs of suit. The cause was referred to a master for an accounting.

Appellee has filed herein a motion to disregard appellants' assignments of error and exceptions "on the ground and for the reasons that said appellants failed to comply with the law and equity rules of this court, in this, to-wit:

"1. That appellants did not present to the trial court at the conclusion of the trial and prior to the submission of the case for its determination by the trial court (a) any motion for judgment, or (b) a request for any specific declaration of law, or (c) a request for any special finding of fact, and/or (d) did not take any other action which fairly presented any specific issue of fact or of law for determination by the trial court.

"2. Appellants failed to make and/or preserve any record of exceptions to the trial court's ruling with respect to a request for findings of a special fact and/or special declarations of law.

"3. Appellants did not separately state their exceptions to the conclusions of law drawn by the trial court from the facts.

"4. That all of said assignments of error and/or exceptions hereinabove specified and identified are based exclusively upon the general findings of fact and the general conclusions of law contained in the trial court's memorandum decision."

Appellee contends that "the trial court's memorandum decision, adopted by the court as its findings of fact and conclusions of law, was not a special finding of fact within the meaning of the statute, but constitutes a general finding"; and, further, "that in the absence of a special finding of fact, or in the absence of a proposed special finding of fact, a review by this court may not extend to a determination of the sufficiency of the facts found to support the trial court's decision."

The purpose of the rule, as stated by the court in the recent case of Seaboard Airline R. Co. v. Watson, 287 U. S. 86, 53 S. Ct. 32, 34, 77 L. Ed. 180, 86 A. L. R. 174, "is to enable·the court, as well as opposing counsel, readily to perceive what points are relied on. The substitution of vague and general statement for the prescribed particularity sets the rule at naught."

We have examined the cases cited by the appellee in support of this motion, as well as the assignments of error and the requests for findings of fact and conclusions of law tendered by appellants, and are of the opinion that such requests are sufficient. The proposed findings, as shown by the record, were timely and contained a request for a finding by the court on the crucial point in the case, namely, a finding as a matter of fact that appellants had not infringed either claims 3 or 7 of the patent in suit. In its brief, appellee states, "The question of contributory infringement in this case is one of fact."

The record shows that the court's opinion was filed on June 15, 1932, and in the concluding paragraph thereof it is recited that, "The decree will be as herein indicated, the findings, conclusions, and decree to be settled upon notice and the parties to be heard upon the question of costs at the time of settling the decree." On July 11, 1932, court and counsel met, in accordance with that suggestion, for the purpose of settling the decree, findings, and conclusions, at which time appellants tendered proposed findings of fact and conclusions of law. The record further shows, over the signature of the court, "The above requests were presented, and the court asked to sign and make same before the court by decree made its findings herein, and each of them is now denied and refused. And exception as to refusal as to each allowed." The court, on the latter date, adopted the findings of fact and conclusions of law as set forth in its opinion, the appellants excepting thereto.

The exceptions are rather voluminous and not necessary to be here set forth; and we need not consider whether they were in fact required in this case.[1] Suffice it to say they specify in detail the grounds of the exceptions. At the end thereof the court made the following statement: "The foregoing exceptions were made to the court in open court at the time the court signed its decree herein, were each considered, and each is now allowed to each excepting defendant."

The assignments of error are likewise set forth in detail, and set forth, among other things, error in admitting in evidence two letters written by appellant Lilly Company to the Arabol Manufacturing Company, dated October 17, 1933, and November 1, 1928, respectively (quoted hereinafter); the refusal of the court to make the proposed findings of fact, requested by appellants, that appellants had not contributorily infringed either claim 3 or claim 7 of the patent in suit; the insufficiency of the evidence to sustain the finding of contributory infringement; error in refusing to conclude as a matter of law, as requested, that appellants had not infringed either of said claims of the patent; error on the part of the court in making the sixth paragraph of its decree, as follows: "That defendants Chas. H. Lilly Co., a corporation, organized and existing under and by virtue of the laws of the State of Delaware, and/or Wilmot H. Lilly have and/or has contributorily infringed said Letters Patent as to the aforesaid mentioned claims of said Letters Patent, to-wit, Claims 3 and 7"; and error in decreeing, in the seventh paragraph of the decree, that a writ of perpetual injunction issue against appellants, which said seventh paragraph is in said assignment specifically set forth.

We think the findings as made by the court and the proposed findings of fact are sufficient to present to this court the question of

[1] Compare: American Can Co. v. M. J. B. Co. (D. C. Del.) 52 F.(2d) 904; St. Paul Fire & Marine Ins. Co. v. Tire Clearing House (C. C. A. 8) 58 F.(2d) 610-613; United States v. McIntosh (D. C. Va.) 3 F. Supp. 715, 716; Virginian Ry. v. United States, 272 U. S. 658-675, 47 S. Ct. 222, 71 L. Ed. 463.

the sufficiency of the facts found to support the trial court's decision.

Appellee also contends that appellants' argument, that soya bean flour had been used extensively in making soya bean adhesive, is not covered by any assignment of error which would direct the attention of either the trial court or counsel for the appellee that any such argument as this would be raised, or any such alleged error of the trial court would be urged. We think appellee is in error in this respect, and that the proposed findings and the assignments of error are sufficient in this regard.

The motion is therefore denied.

Appellants now concede the validity of the patent and its infringement by their co-defendants, and the only question before this court is the complicity of appellants, that is, whether the evidence supports the finding and decree that they contributorily infringed claims 3 and 7 of the patent by reason of having, in concert with the codefendant, Kaseno Products Company, supplied to that company an element to be used in the patented combination, namely, soya bean flour, which the Kaseno Products Company used in manufacturing an infringing glue.

In treating the question of contributory infringement in its memorandum decision (59 F.(2d) 811, 820, 821), the trial court said:

"The defendants Chas. H. Lilly Company and Wilmot H. Lilly are sued for contributory infringement. It is alleged that these defendants sold to the Kaseno Products Company soya bean material adapted and intended to be employed as a substantial part of the infringing adhesive of the defendant Kaseno Products Company, knowing that said material was to be used in the manufacture of the infringing adhesive; that the defendant Wilmot H. Lilly is the president of the Chas. H. Lilly Company and directs and controls all of its acts and is directly and personally in charge of conducting the infringing acts of said company of which complaint is made. The evidence has established that the defendant Wilmot H. Lilly, as alleged, directs and controls the acts of his company.

"It has been stipulated that these two defendants on and before the bringing of the present suits 'sold and delivered and is now selling and delivering to the Kaseno Products Co., a co-defendant herein, soya bean seed cake ground to glue specifications, that is eighty mesh or finer, for use in the manufacture of the adhesives or glues of said company.'

"Two letters of the defendant Chas. H. Lilly Company, were introduced in evidence. These letters are as follows:

" 'October 17, 1928.
" 'The Arabol Manufacturing Co., 110 East 42nd St., New York, N. Y.
" 'Gentlemen: We are manufacturers of Soya Bean Flour which is being used extensively on this Coast as a base in waterproof glue. Glue made from this material has almost entirely replaced casein glue in the manufacture of Ply wood or veneer. Formerly the mills in this territory used practically nothing but casein glue in the manufacture of these panels but have now switched to a Soya Bean glue with which they secure as good or better adhesive at a far lower cost.

" 'We understand you people are the largest manufacturers in the world of various adhesives and the thought occurred to us that if you are not now using Soya Bean flour in any of your products you might be interested in doing a little experimenting along this line. If you are already using this material we would be only too glad to submit samples of our product and quote you prices.

" 'Our material is a true Soya Bean flour in every sense of the word and is not to be confused with various grades of fine ground Soya Bean meal which are sometimes offered. Our material is specially processed to remove a very large percentage of the fiber and is bolted through a flour mill process through a fineness of 100, 109, or 126 mesh. We have sold large quantities to glue manufacturers on the coast here and have shipped some to the glue manufacturers in the furniture district around Grand Rapids, Michigan, and also to various glue manufacturers on the East Coast, and in every case our product has met with their approval as to quality and uniformity, and we know that our prices are in line, and have been getting repeat business from them. We believe that if you are not now using Soya Bean Flour in any of your products it would certainly be to your interest to investigate its use, and to that end we are glad to furnish you with what samples and information we have on the subject.

" 'Awaiting your reply and trusting that we may be of some service to you, we are
" 'Yours very truly,
" 'Lilly's—Seattle.
" 'SEV—PE        By S. E. Victor.'
" 'Nov. 1, 1928.
" 'The Arabol Manufacturing Co., 110 East 42nd St., New York, N. Y.
" 'Via: Air Mail.
" 'Gentlemen: Attention, Mr. A. M. Baumann:

" 'We thank you for your letter of Oct. 23d and are glad to know that you are interested in Soya Bean Flour. We are sending you a 25 lb. bag of this material as a sample. We are sending you only the one grade which has been processed through 100 mesh. This is the grade that is in the greatest demand in this section of the country, although we have made some flour as fine as 109 and 126 mesh. The various glue manufacturers seem to prefer the finer mesh, however they have been buying the 100 mesh inasmuch as the cost is less.

" 'We are pleased to quote you a price of $65.00 per ton, F.o.b. Seattle, draft terms, in car lots, on this grade; or $70.00 per ton F.o.b. Seattle, draft terms, in less than car lots.

" 'This is a comparatively new commodity on the market and considering the short length of time it has been used it has gained the approval of Glue manufacturers in this locality. We have been told indirectly that Laucks & Company of Seattle handle hundreds of tons of this material each month, and it is said that they are using it both for Glue and for a wall texture. Several other manufacturers on this Coast and on the East Coast are buying the material in carload lots, and one of these manufacturers who turns out nothing but glue is now using four to five cars monthly. We see great possibilities for the use of Soya Bean Flour in your territory and are pleased that you are taking an interest in it and will undoubtedly do some experimenting. We shall be pleased to hear from you as to what you think of the material and how your experiments work out.

" 'Thanking you for the opportunity of quoting and submitting samples, and trusting that we may be of further service to you, we are

" 'Yours very truly,
" 'The Chas. H. Lilly Co.
" 'SEV—PE          By S. E. Victor.'

"The foregoing is sufficient to show contributory infringement on the part of these defendants and to take the case out of the rule that one who sells to an infringer an article of commerce having ordinary uses unconnected with the product of the patent, without intent to contribute to the manufacture of such product, does not infringe. The stipulation and letters show that it was the intent of these defendants that the article sold by them should be used in the manufacture by their codefendants of the product of plaintiff's inventions. Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C. A.) 80 F. 712, 721–723; Electro Bleaching Gas Co. v. Paradon

Engineering Co. (C. C. A.) 12 F.(2d) 511, 513; Trico Products Corporation v. Apco-Mossberg Corporation (C. C. A.) 45 F.(2d) 594, 599; Walker on Patents (5th Ed.) § 407. These defendants have also infringed the claims of the three patents which have been held valid and infringed by the other defendants."

The other patents referred to by the court in the sentence last quoted were adjudicated in the same suit, and appellants have likewise appealed from the decree adjudging them contributory infringers thereof. That appeal is disposed of in a memorandum opinion, case No. 7084 (C. C. A.) 68 F.(2d) 190, filed herewith.

Appellants' contention in this court, as broadly stated in the brief, is this: "Appellants are no more liable for contributory infringement of claims 3 and 7 of the Johnson Patent, by reason of having supplied soya bean flour to Kaseno Products Co., than is the city which furnished the water with which the infringing glue was made. Water is just as essential an element in glue making under the Johnson Patent as is soya bean flour, yet both the water and the flour may be used in various ways, none of which would constitute infringement. Appellee could not hold the furnisher of the water liable for contributory infringement without affirmatively proving an actual wrongful intent to aid in infringement. Appellants are in no different position than the city which furnished the water."

More specifically, it is contended that, to be guilty of contributory infringement of the patent in suit, "appellants must have sold soya bean flour to the defendant Kaseno Products Company with the intent and for the purpose of aiding and abetting Kaseno Products Company in making a glue which infringed claims 3 and 7 of the patent. There must have been some concert of action between appellants and the defendant Kaseno Products Company, who did the injury, before appellants can be held liable. If appellants knew that appellee had a patent covering the use of soya bean flour, sodium fluoride and hydrated lime, and knew that the defendant Kaseno Products Company was making a glue comprising these elements, and purposely and intentionally furnished one element, namely, soya bean flour, intending to aid the defendant Kaseno Products Co. in its infringing act, then * * * appellants would be guilty of contributory infringement." "In order to recover, it was incumbent upon appellee to prove that appellants

intentionally and purposely aided Kaseno Products Co. in making a glue covered by claims 3 and 7 of the patent. A wrongful intent and purpose constituted the gist of appellee's alleged cause of action." "There was a complete failure of proof on appellee's part to sustain the cause of action alleged."

The parties are agreed that the law of contributory infringement, so far as applicable to the case at bar, is well stated by the late Chief Justice Taft in Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C. A.) 80 F. 712, 721–723, where that learned judge expressed the general reasons for and the principles underlying the subject as follows:

"It is well settled that where one makes and sells one element of a combination covered by a patent with the intention and for the purpose of bringing about its use in such a combination he is guilty of contributory infringement and is equally liable to the patentee with him who in fact organizes the complete combination. * * * An infringement of a patent is a tort analogous to trespass or trespass on the case. From the earliest times, all who take part in a trespass, either by actual participation therein, or by aiding and abetting it, have been held to be jointly and severally liable for the injury inflicted. There must be some concert of action between him who does the injury and him who is charged with aiding and abetting, before the latter can be held liable. When that is present, however, the joint liability of both the principal and the accomplice has been invariably enforced. If this healthful rule is not to apply to trespass upon patent property, then, indeed, the protection which is promised by the constitution and laws of the United States to inventors is a poor sham. Many of the most valuable patents are combinations of nonpatentable elements, and the only effective mode of preventing infringement is by suits against those who, by furnishing the parts which distinguish the combination, make it possible for others to assemble and use the combination, and who, by advertisement of the sale of such parts and otherwise, intentionally solicit and promote such invasions of the patentee's rights. * * *

"What we have said has application only to cases in which it affirmatively appears that the alleged infringer is offering the parts with the purpose that they shall be used in the patented combination. We have found that it does so appear here, and is a matter of certain inference from the circumstance that the parts sold can only be used in the combinations patented. Of course, such an inference could not be drawn had the articles, the sale or offering of which was the subject of complaint, been adapted to other uses than in the patented combination. In the latter case the intention to assist in infringement must be otherwise shown affirmatively, and cannot be inferred from the mere fact that the articles are in fact used in the patented combinations or may be so used."

Contributory infringement has also been considered and defined by the Supreme Court. In the case of Henry v. A. B. Dick Co., 224 U. S. 1, 32 S. Ct. 364, 365, 56 L. Ed. 645, Ann. Cas. 1913D, 880, the plaintiff, A. B. Dick Company, owned a patent covering a stencil-duplicating machine, known as the "Rotary Mimeograph," and sold one of the patented machines to one Skou with a license restriction that it be used only with the stencil paper, ink, and other supplies made by A. B. Dick Company. The defendant, Henry, sold to Skou a can of ink suitable for use with the mimeograph, with knowledge of the license agreement and with the expectation that it would be used in connection with the patented machine. The question certified to and considered by the Supreme Court in that case was, "Did the acts of the defendants constitute contributory infringement of the complainant's patents?" The court said (page 48 of 224 U. S., 32 S. Ct. 364, 379, 56 L. Ed. 645):

"The facts upon which our answer must be made are somewhat meager. It has been urged that we should make a negative reply to the interrogatory as certified, because the intent to have the ink sold to the licensee used in an infringing way is not sufficiently made out. Undoubtedly a bare supposition that by a sale of an article which, though adapted to an infringing use, is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer. Such a rule would block the wheels of commerce. There must be an intent and purpose that the article sold will be so used. Such a presumption arises when the article so sold is only adapted to an infringing use. Rupp & Wittgenfeld Co. v. Elliott, 65 C. C. A. 544, 131 F. 730. It may also be inferred where its most conspicuous use is one which will co-operate in an infringement when sale to such user is invoked by advertisement. Kalem Co. v. Harper Bros. decided at this term, 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92 [Ann. Cas. 1913A, 1285]."

The rule of that case, recognizing the right of an owner of a patented machine to restrict the use thereof after sale, was overruled by the Supreme Court following the enactment of "An Act To supplement exist-

ing laws against unlawful restraints and monopolies, and for other purposes," 38 Stat. 730, which provides that:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States * * * or fix a price charged therefor * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." (15 USCA § 14.)

See Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959.

The fact that the case of Henry v. A. B. Dick Co., supra, was overruled, however, in nowise detracts from the weight of the definition and test of an action for contributory infringement as stated by the Supreme Court in that case.

In the case of Individual Drinking Cup Co. v. Errett (C. C. A. 2) 297 F. 733, 735, the patent was for a machine adapted to dispensing paper drinking cups, and the trial court had entered a decree holding that defendant Errett's sales of cups to owners of infringing machines constituted contributory infringement. The appellate court, after stating that one of the questions before it was "Whether on the evidence in this particular case defendant Errett was guilty of contributory infringement," continued:

"The doctrine of contributory infringement must be viewed in two aspects: (1) That of basic principle; and (2) that of the history and meaning of the cases. The broad principle is stated by Judge Taft in Thomson-Houston Electric Co. v. Ohio Brass Co., 80 F. 712, 721, 26 C. C. A. 107, 116. * * *

"Like all statements of principle, the difficulty lies in its application. This is peculiarly true in respect of patent infringement, because of the varying character of patents, exemplified, to illustrate, by two broad classes; i. e., combination patents and those which are not combination patents. Subdividing combination patents, we find those where the structure or device requires the making of some particular form or shape to supply an element of the combination, and those which merely require an ordinary article of commerce. To illustrate: In the former instance, there might be needed a piece of steel of definite length, height and width, curved in a particular manner in order to fit into and make up a part of the structure or device in question, while, in the latter, there might be required merely a strip of steel of usual commercial length, height, and width of no particular form or shape which might be used for one of many purposes.

"Another consideration, referred to infra, must be borne in mind. Many of the notable cases on contributory infringement arose in connection with licenses or conditions which attached restrictions to the use of the patented article, and it is important in reading these cases to note, not only the particular facts, but also the points of law discussed and decided, as they affect the validity and extent of restrictive provisions."

After reviewing several of the leading cases on the subject, the court said:

"In the last analysis, the fundamental thought is that, before one may be held for contributory infringement, it must be shown that he had knowingly done some act without which the infringement would not have occurred."

In concluding, the court said:

"Where, as here, however, any paper cup of proper size is available for the purposes of the infringing device, just as any gum or chocolate package of proper size is available for a slot machine, the mere sale or use of the paper cup, like the mere sale or use of the gum or chocolate package with the knowledge that the same was to be used in a patented machine, cannot charge the vendor of the cup or the vendor of the gum or chocolate with contributory infringement, and, finally, it would, indeed, place a heavy burden upon trade, and go far beyond the beneficial purposes of the patent monopoly, to hold that it was the duty of the vendor of an unpatented article of commerce to ascertain whether the article was, as held by the decree below, 'adapted for use' in the infringing apparatus 'under such circumstances as would lead a reasonable person to suppose that the purchasers meant to use' the article in the infringing apparatus. Such a duty would require vendors of the almost limitless ordinary articles of trade, whether in raw or manufactured form, to determine first whether the device was an infringement, and, secondly, to

what use the lumber, steel, or what not was to be put by the purchaser. We conclude, therefore, that the injunction decree was too broad, and should be modified as set forth in the margin."

In dismissing the bill in General Electric Co. v. Sutter (C. C.) 186 F. 637, 638, the court said:

"In this case the General Electric Company, the owner of patents * * * for electrical distribution, charge the Pittsburgh Transformer Company with infringement thereof. It is not contended the latter company has itself infringed, but it is averred the Allegheny County Light Company has done so in a certain electrical plant operated by it, and that the Transformer Company has contributed to that infringement by making four transformers therefor. The Light Company is not a party to the bill; and, as the transformers in question constituted a single order and the Transformer Company have never made or contemplated making any like transformers, it will be seen the case turns primarily on the question whether that company bears the relation of a contributory infringer. An examination of the proofs satisfies us it does not, and therefore on the other questions involved we express no opinion.

"The legal principles governing contributory infringement are clear. Contributory infringement exists where one knowingly concerts or acts with another in an unlawful invasion of a patentee's rights. If such assistance is given by furnishing an essential part of an infringing combination and the part furnished is adapted to no other than an infringing use, such contribution makes him a contributory infringer. On the other hand, if the part furnished is adapted to other and lawful uses, in addition to infringing uses, then an intent to furnish for infringing use must be established before the furnisher can be held a contributory infringer. In the present case the transformers were adapted to other and lawful uses besides the use the Light Company made of them. The burden is therefore on complainant to show a knowledge or intent on the part of the Transformer Company that the transformers were to be used for infringing purposes. That burden, we think, the complainant has not met."

In 48 C. J. § 516, "contributory infringement" is defined as follows:

"Contributory infringement is the intentional aid of one person by another in the unlawful making or selling or using of the patented invention; and a contributory infringer is a person who induces, aids or contributes to wrongful acts of another which constitute infringement of a patent. The essence of contributory infringement lies in concerting with others in an unlawful invasion of the patentee's rights; an intent to aid is necessary; and before one may be held for contributory infringement, it must appear that he has knowingly done some act without which the infringement would not have occurred."

And in section 518 it is said:

"A person is guilty of contributory infringement when, without authority from the patentee, he manufactures, sells, or furnishes one or more parts or elements of a patented combination with the intent and for the purpose of bringing about the use thereof in such combination after another person, such as the purchaser or user, has supplied the other parts or elements, if any, and assembled all the parts into the complete combination. * * * The rule is undoubtedly applicable where the part furnished is adapted to no other than an infringing use, it being presumed in such case that it is intended for such use; but it is not necessarily applicable where the part furnished is adapted to other and lawful uses, in addition to infringing uses, especially where it is a common article of commerce, and in such case contributory infringement exists when, and only when, there is an intent to furnish for infringing use."

In section 579 of the same volume, the rule as to the burden of proving intent in such an action is stated as follows:

"In an action for contributory infringement, plaintiff has the burden of showing an intention on the part of defendant to aid another person in infringing the patent; and while a person who sold an article capable of use only in a patented combination is presumed to have intended it should be so used, yet where the article is also capable of other uses, an intent that it should be used in an infringing way must be affirmatively shown."

Many other cases on contributory infringement might be referred to, but the majority of the cases cited by counsel and which our research has disclosed have no direct bearing on the case before us, because, unlike this case, they are (1) cases wherein the question of contributory infringement arose in connection with licenses or conditions which imposed restrictions upon the use of the patented article; (2) cases dealing with the furnishing of replacement and repair parts or elements for use in the patented combination; (3) cases wherein the alleged contributory infringer manufactured or sold some article or

device peculiarly adapted to use in the patented combination, with knowledge of the contemplated infringement, or under such circumstances that knowledge or intent to infringe was presumed. Cases of the latter class are obviously the most analogous to the case at bar, especially as appellee contends that appellants furnished soya bean flour to Kaseno Products Company under circumstances from which an intent to aid in infringing the patent may be presumed, and that the flour so furnished by appellants "was a specially prepared product adaptable for only one use and intended only for one use, namely, that of the manufacture of an infringing glue." The reasoning in the various types of cases, however, may, by analogy, be employed in arriving at a conclusion in this case, for the basic principle underlying the subject is the same in the many diverse actions for contributory infringement.

■ The quotations from the foregoing authorities have been set forth with a view to determining the exact definition of contributory infringement, the test to be applied in determining a defendant's liability in such an action, and the burden of proving, when and if necessary, the intent and purpose on the part of the defendant to contribute to the infringement. We believe it is well settled by the authorities that, in an action for contributory infringement of the nature of this case, the principal and controlling question is, Did defendant furnish to the infringer an element to be used by the latter in infringing complainant's patent, and did defendant furnish such element with the intent and purpose that it would be so used? Or, as pertains this case, Did appellants furnish soya bean flour to the Kaseno Products Company with the intent and for the purpose that it would be used in manufacturing a glue which would infringe appellee's patent? And under the foregoing authorities, and inasmuch as the element furnished by appellants is capable of other uses than in the patented combination, as will hereinafter appear, "the intent that it should be used in an infringing way must be affirmatively shown." 48 C. J. § 579, supra.

Before proceeding further, we wish to state that we do not concur in appellee's interpretation of the statement by the Supreme Court in Henry v. A. B. Dick Co., 224 U. S. 1, 32 S. Ct. 364, 379, 56 L. Ed. 645, Ann. Cas. 1913D, 880, supra, namely, that from the "most conspicuous use" of the element furnished may be inferred an intent to infringe. Such an interpretation would go far to "block

the wheels of commerce," and would tend to negative the rule, as there stated, that where the element furnished, "though adapted to an infringing use, is also adapted to other and lawful uses, * * * there must be an intent and purpose" that the element will be used for an infringing purpose.

The cases cited by the trial court in its memorandum decision, in connection with its finding of contributory infringement are not, in our opinion, persuasive here, for the reason that those cases deal with articles or devices adapted to be used only in an infringing way, as distinguished from the element furnished by appellants, which is capable of noninfringing uses. We will briefly analyze the three cases relied upon by the trial court in support of its finding of contributory infringement.

The first case cited, Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C. A.) 80 F. 712, 720, supra, is readily distinguishable from the case at bar, as the following statement from the opinion of the court sufficiently discloses:

"The catalogue of the defendant shows that it is offering for sale to the public without restriction the switch and trolley to be used as part of the equipment of an electric street railway. Defendant has not shown, and we infer from the evidence that it cannot be shown, that either the switch or trolley and harp can be used in an electric railway except in the combinations described and claimed in the two patents here in suit. * * * The evidence sufficiently shows that neither the trolley nor the harp is adapted to be used on electric street railways except in the above combination. Purchasers buy articles for practical use, and would only buy the switch and trolley, therefore, for use in complainant's patented combinations. One is legally presumed to intend the natural consequences of his act. Hence, the defendant, in offering the switch and trolley for sale to the general public, may be reasonably held to intend that they should be used in combinations in an electric railway covered by the claims of complainant's patents."

The second case relied upon by the court is likewise easily distinguishable from the case at bar. That case is Electro Bleaching Gas Co. v. Paradon Engineering Co. (C. C. A. 2) 12 F.(2d) 511, 513, and the distinction is at once apparent from a reading of the following excerpt from the opinion:

"* * * If defendant is offering for sale a device which may be used, is ordinarily used, and is sold for the purpose of being

used, for the purification of water in accordance with plaintiffs' process, and by a means which is the equivalent of plaintiffs' disclosed means, there can be no doubt of plaintiffs' right of recovery."

Nor is the third case cited by the court analogous to the facts at bar. That case is Trico Products Co. v. Apco-Mossberg Corp. (C. C. A. 1) 45 F.(2d) 594, 599, and the court there said:

"While the defendant only sold a multi-ply wiping element, it would be futile, we think, to claim that it did not sell it to the trade, at least until this suit was brought, with the expectation and intention that it would be used in an attachment permitting a rocking motion, or that it was not a copy of the plaintiff's wiping element. We think it was a contributory infringement of claim 2 of the plaintiff's patent. Its action in later inserting a bolt or screw in its wrappers with instructions that the wiper be rigidly fastened in the holder, indicates that it realized that it was at least contributing to an infringement of claim 2, if it sold a multi-ply wiper for the purpose and adapted to be mounted in a holder in a manner to secure the same results as the plaintiff's combination."

As above stated, the learned court, in its opinion which was adopted as its findings, said:

"The stipulation [that appellants furnished to Kaseno Products Company Soya bean seed cake ground to glue specifications, that is eighty mesh or finer, for use in the manufacture of the adhesives or glues of said company] and letters [from appellants to Arabol Manufacturing Company] show that it was the intent of these defendants that the article sold by them should be used in the manufacture by their codefendants of the product of plaintiff's inventions."

██ If we assume that this finding is based upon the established facts referred to above, and none other, then this court, having the same facts before it, must draw its own inferences and deduce its own conclusions. If, on the other hand, the finding is based upon other and conflicting evidence, and involving questions of the credibility of witnesses, then this court will not disturb such finding, unless there is obvious mistake of fact or serious error of law.

There is evidence that appellee, in 1925 and 1928, published notice in The Timberman, a lumber journal, that its patents gave it the "exclusive rights to the use of soya beans and soya bean flour for glue making purposes." Likewise, every sack of glue which appellee sold had attached thereto a tag which stated that the article was patented. This evidence, however, adds nothing to the facts as established by the stipulation and the letters, so that there is here no question of conflicting evidence or credibility of witnesses. Furthermore, there is little or no contradiction of appellant Lilly and the witness Victor, purchasing agent of appellant company, who testified in part as follows:

"My name is Wilmot H. Lilly. * * * I am * * * president of the defendant, The Chas. H. Lilly Co. I have been actively connected with the operation of that company for twenty-five years. The Chas. H. Lilly Co. first commenced the manufacture of soya bean flour in about 1916 or 1917. At that time the flour was manufactured for use as tree spray and for edible purposes. The company has continued the manufacture of soya bean flour ever since. * * * We have been selling locally, in California, Michigan and Pennsylvania. We sold it wherever we could get orders for it. We have what we call our regular soya bean flour. Our regular soya bean flour, ground in the usual manner, is all practically 100 mesh or better; that is, it goes through a 100 mesh screen or better. That is our standard soya bean flour and is used for tree spray and edible purposes. When our company receives an order for soya bean flour, we grind it 100 mesh or better; that is our regular fineness.

"We have sold our product to I. F. Laucks, Inc. We first furnished them with soya bean flour in February, 1928. They wanted five tons. The flour we sold them was our standard product, ground to 100 mesh or better. We furnished them soya bean flour for approximately a month and a half, furnishing them better than 100 tons during that time. It was all ground to the same fineness, 100 mesh or better. There were a number of shipments. We continued to supply soya bean flour to Laucks until the latter part of April, 1928. We have received no orders since that time.

"During that time we were furnishing soya bean flour to the Kaseno Products Co. The flour sold to the Kaseno Products Co. was, I think, ground to the same specifications as the Laucks' flour. We first commenced to furnish soya bean flour to the Kaseno Products Co. in either 1926 or 1927. Prior to that time we had sold them soya bean material.

"The difference between meal and flour is that the meal is a cake ground up on some sort of mill that does not get it down to the fineness of flour. The flour is ground by a

different process, milled through a silk cloth to make the flour. Flour is meal further processed. Up to 1926 or 1927 we furnished them soya bean meal. Since that time we have been furnishing them soya bean flour ground to 100 mesh or better.

"During the period of time we furnished the Kaseno Products Co. with soya bean flour, ground to our standard specifications, we were furnishing soya bean flour to other persons or corporations in the United States. We sell just as much as we can. We try to sell to anybody that will buy it. We sell to anybody that we can sell flour to, like grocery stores, spray manufacturers, glue people and furniture manufacturers.

"The Chas. H. Lilly Co. at this time operates a flour mill, and is engaged in the fertilizer business and seed business. We grind wheat flour, principally, bran, whole wheat, and we have ground rice flour, various kinds. We grind any type of flour we can sell. We built our flour mill in 1905. Since that time we have been engaged in the milling of different kinds of flour.

"The Chas. H. Lilly Co. has never been engaged in the treating or processing of flour with chemicals of any kind. We never had anything to do with that. We have never at any time treated the soya bean flour we sold to the Kaseno Products Co. with chemicals. Since 1927 we have ground approximately 150 tons of soya bean flour per month. Since 1927 we have imported an average of 1,800 to 2,000 tons of soya bean meal a year. We imported it from the Orient. Approximately 150 tons is processed into flour each month, and disposed of wherever we can find a market.

"The Chas. H. Lilly Co. has attempted to develop markets for soya bean flour. We have written letters to everybody that we thought would be interested in it. My brother travels in the east, and has stopped at various places to inquire if there is any market for flour. Those letters were sent out to other concerns than glue manufacturers. I have interviewed calcimine companies and spray manufacturers in California. I have interviewed anyone that I thought might have any use for soya bean flour.

"At no time when the Kaseno Products Co. was ordering this flour from us did they explain to us the method or manner in which they used it. We were never familiar with the process by which they manufactured any adhesive that they might manufacture. We never had any discussion with them about the manner in which they used it.

"Neither Mr. Laucks nor anyone connected with I. F. Laucks ever notified us that they claimed the Kaseno Products Co. was infringing any patent held by them, prior to the institution of these actions. That matter was never discussed by them. We did not know that the Kaseno Products Co. was violating any right of I. F. Laucks. We first learned that they were making such claim when we were served with the Laucks' suit. That was the first notice we had ever been given.

"There are a number of concerns in the City of Seattle manufacturing soya bean flour for glue purposes. Among them are: Fisher Flouring Mills, Albers Bros. Milling Co., and the Soya Millers, Inc. The Soya Millers, Inc., started in 1928.

"When we delivered the soya bean flour about which I have testified, we never at any time had any knowledge as to the manner in which Kaseno Products Co. was using it. We were simply filling orders that came to us in the regular course of business."

On cross-examination the witness testified as follows:

"I knew that the Kaseno Products Company was using this flour to manufacture glue. We didn't know that, however, when they first started in. They were manufacturing earwig bait and a lot of things. When we would get an order for soya bean or soya bean flour, we didn't know at that time anything about what they were doing. I presume in 1927 we knew they were using it to make glue.

"We are selling soya bean flour to the Perkins Glue Company in Pennsylvania, and I assume they are making glue out of it. We have not sold them lately, but we did sell them prior and subsequent to February, 1928. We have sold soya bean flour to the Hercules Glue Company, and the Henning Manufacturing Company of Saginaw, Michigan, both of which are manufacturers of adhesives. We are still selling soya bean flour to this concern in Saginaw, Michigan, for glue making purposes. Sometimes we sell them a carload and sometimes a ton per month. Whenever they order it, we ship it.

"I did not know that I. F. Laucks, Inc., owned patents covering the manufacture of glue from soya bean flour. I never heard of it before this lawsuit was commenced. Most of the soya bean flour we have sold since 1927 went into glue plants; that is, glue manufacturing concerns. * * * Most of our sales went for glue making purposes. * * *

"Neither myself nor the Chas. H. Lilly Co. have had any connection whatsoever with

either Mr. Linquist or the Kaseno Products Co., other than selling them flour, just the same as any other customer. We have no financial interest whatsoever in the Kaseno Products Co., and never had any such interest. We have never had anything to do with the management or control of the business of that company. Neither myself nor any member of the Chas. H. Lilly Co. has ever in any manner superintended or suggested the use of this flour by the Kaseno Products Co. We have never suggested or recommended to any glue manufacturer the particular manner in which this flour should be used in the manufacture of any adhesive. We have never suggested any commercial product or material of any kind which was suitable for use with the soya bean in manufacturing adhesives. We have never at any time had any knowledge of any particular material or chemical which might be combined with the soya bean flour in adhesives. I don't know anything about that. I have never had anything to do with that. * * * "

"My name is S. E. Victor. As purchasing agent for the Chas. H. Lilly Co., I ordinarily handle the orders for soya bean flour and put the orders through. I have been connected with the Chas. H. Lilly Co. since July 25, 1922. I am familiar with the sales of soya bean flour during the past five or six years. During that time there has been a standard price established for soya bean flour from time to time just as with any other merchandise. The price is governed by the buying price and the cost of manufacture; and we set a standard price on it from time to time. The price is not determined or affected in any way by the party to whom we are selling. It is just like selling whole wheat flour or any other product that we sell. We have a standard price on it to one and all. We have sold I. F. Laucks and the Kaseno Products Co. on the same day. The price was identical to both parties. Anyone else who ordered soya bean flour from us would get identically the same price. There is no discrimination. We have never favored the Kaseno Products Company with any special price lower than the standard market price."

■ After a careful consideration of the stipulation and letters and all of the evidence adduced, we have reached the conclusion that there is no substantial evidence tending to establish knowledge and intent on part of the appellants that the product furnished by them to Kaseno Products Company was to be or was being used by the latter for infringing purposes, or in the manufacture of the product of appellee's invention. We further conclude that there are no facts and circumstances disclosed from which such knowledge or intent might fairly be inferred or presumed, and that in the circumstances the appellants were not charged with the duty of ascertaining the character of the use to which Kaseno Products Company was putting the element furnished to it by appellants. "Such a duty," as said by the court in Individual Drinking Cup Co. v. Errett (C. C. A.) 297 F. 733, 740, supra, "would require vendors of the almost limitless ordinary articles of trade, whether in raw or manufactured form, to determine first whether the device was an infringement, and, secondly, to what use the lumber, steel, or what not was to be put by the purchaser." As will hereinafter appear, we are of opinion that the element furnished by appellants was an ordinary article of trade.

For insufficiency of the evidence to support the charge and finding of contributory infringement on the part of appellants, the decree must be reversed.

■ As just indicated, however, we wish to add that there is, in our opinion, an equally cogent reason why the decree may not stand; namely, soya bean meal and soya bean flour are standard articles of commerce; and being such a sale thereof may not be enjoined.

In its brief, appellee states: "There is no doubt that soya bean meal had long been an article of commerce," but "soya bean flour was not an ordinary article of commerce until such time as the appellee established the soya bean industry, in which it was preferable to use soya bean flour ground to glue specifications, 80 mesh or finer. From that day down to the present time, due to the extensive use of the flour in the soya bean glue industry, it may now be said to be a standard article of commerce for such use." "Counsel makes reference to the fact that during the trial of the case appellee made reference to standard soya bean flour. It was such at the time of the trial, but that is not any proof that it was such at the time Lilly commenced furnishing it to the Kaseno Products Company."

In the specifications of appellee's caustic soda patent (litigated in the companion case, No. 7084 (C. C. A.) 68 F.(2d) 190, submitted herewith), it is stated: "As to the fineness of the flour, it is not necessary that the meal be ground as fine as indicated above, but fineness is desirable from a practical standpoint."

Appellant Lilly testified, as set forth above, "that there were other concerns in the city of Seattle who had manufactured soya

bean flour for glue purposes"; but, says appellee, "any manufacturer of soya bean flour as an adhesive base for glue purposes would still be an infringing act unless that flour had been sold to I. F. Laucks, Inc., the owner of the patent, or to one who was licensed by the patentee to use the patented article."

The evidence establishes that soya bean meal was used and useful for a number of specific purposes: manure, fertilizer, and stock food; and that soya bean flour is used for tree spray and edible purposes.

We are therefore unable to accept appellee's contention that soya bean flour was not a standard or ordinary article of commerce prior to the time that appellee claims to have established the soya bean industry. The evidence establishes that it was such article of commerce and was used for a number of purposes. It is true that it was used in the manufacture of glues by the Kaseno Products Company, and that appellants so stipulated, but it was not stipulated, nor was it established by evidence that it "was only useful when combined in the manner used in the patent."

The language used by the court in Leeds & Catlin Co. v. Victor Talking Machine Co. (C. C. A. 2) 154 F. 58, 60, 23 L. R. A. (N. S.) 1027 (affirmed 213 U. S. 325, 29 S. Ct. 503, 53 L. Ed. 816), is pertinent:

" * * * The doctrine of contributory infringement has never been applied to a case where the thing contributed is one of general use, or suitable to a variety of other uses, especially where there is no definite purpose that the thing sold shall be employed with others to infringe a patent right. Rumford Chemical Works v. Hygienic Chemical Co. (C. C.) 148 F. 862, and cases cited."

The language of Judge Coxe, in Cortelyou v. Charles E. Johnson & Co. (C. C. A. 2) 145 F. 933, is also apposite here. In that case the court was considering an appeal from a decree "awarding an injunction restraining the defendant from selling ink to the licensees of a machine known as the 'rotary neostyle,'" which was sold with the license restriction that it can be used only with stencil paper, ink, and other supplies made by the Neostyle Company, and it is there said:

"When confined to articles, whether covered by the patent or not, which are made for the express purpose of inducing infringement and are not intended for any legitimate use, the doctrine of contributory infringement is logical, just and salutary. But we

doubt the wisdom of extending it to the ordinary commodities of life, used in connection with a patented machine, because the patentee sells or licenses the machine upon the condition that he alone is to furnish these commodities. Care should be taken that the courts, in their efforts to protect the rights of patentees, do not invade the just rights of others, engaged in legitimate occupations, by creating new monopolies not covered by patents and by placing unwarrantable restrictions upon trade.

"We think it is clear that the doctrine may be carried far enough to produce such results. For instance, should the patentee of a fountain pen, by such a notice as we have under consideration, be permitted to hold as an infringer one who sells ink to the owner of the pen even though he knows of the restriction? To compel the dealer to make inquiries and take the precautions necessary to save himself from being sued as an infringer would place intolerable burdens upon business. Should the patentee of a motor car, by such proceedings, be able to hold the monopoly on all gasoline used in its propulsion, or the patentee of a stove or a refrigerator have an action of infringement against one who furnishes ice or coal, respectively, to its owner? These may seem to be extreme cases and yet they are not so far beside the mark as may at first appear. It was stated at the bar that among the 'supplies' necessary for the operation of the neostyle were oil and varnish. It is not easy to perceive how a machinist who lubricates the machine and the painter who varnishes it can escape the charge of infringement. If the doctrine be driven to its ultimate conclusion the merchant and the consumer may find themselves enmeshed in a network of monopolies embracing all the necessaries of life. No one may safely sell coffee to the consumer but the patentee of his coffee mill, no one can furnish him flour but the patentee of his baking pans and he may yet be compelled to buy milk from the patentee of his milk can and soap from the patentee of his bath tub. It is manifest that the doctrine may be expanded ad infinitum. We incline to the opinion that the line should be drawn to include those articles which are either parts of a patented combination or device or which are produced for the sole purpose of being so used and to exclude the staple articles of commerce."

That portion of the decree appealed from, holding appellant Lilly and appellant Lilly Company liable as contributory infringers of appellee's patent, is therefore reversed.