THE UNIVERSITY OF ILLINOIS FOUNDATION, Plaintiff,

v.

BLOCK DRUG CO., Amm-i-dent, Inc., F. W. Woolworth Co., and Chester J. Henschel, Defendants.

Civ. No. 2410.

United States District Court E. D. Illinois.

July 12, 1955.

Charles J. Merriam, of Merriam & Lorch, John Rex Allen, and Robert V. Conners, Chicago, Ill., for plaintiff.

Robert S. Dunham, of Cooper, Dunham, Keith & Dearborn, and Thomas J. Byrne, Jr., and William R. Liberman, New York City, for defendants.

PLATT, District Judge.

The plaintiff, The University of Illinois Foundation, has filed a suit against F. W. Woolworth Co., Amm-i-dent, Inc., and Chester J. Henschel, alleging that the defendants have infringed upon their two patents for "ammoniated" dentifrices. Personal service was obtained only upon F. W. Woolworth Co. The suit was dismissed as to the defendant Henschel. A Stipulation was entered into between the parties whereby this court obtained jurisdiction of Amm-i-dent, Inc. and Block Drug Company.[1]

1. "That the defense of this action is controlled or directed by Block Drug Company and Amm-i-dent, Inc., by whom defendant's attorneys have been retained and from whom defendant's attorneys receive instructions relative to the defense of this suit. All expenses are being paid by Amm-i-dent, Inc., Block Drug Company, although defendant F. W. Woolworth Co. is kept advised of the progress of the litigation and is agreeable to being represented by counsel here appearing on its behalf. Block Drug Company, being Woolworth's supplier

Woolworth has sold Amm-i-dent dentifrices, both in powder and paste form, within this district since the issuance of the plaintiff's patents. The formula for Amm-i-dent Tooth Paste is as follows:

| | |
|---|---|
| Urea | 13.00% |
| Diammonium phosphate [2] | 3.00% |
| Abrasives | 39.79% |
| Liquid excipient | 40.16% |
| Binder | .28% |
| Flavor | 1.77% |
| Detergent | 2.00% |
| pH adjusted to 7.0 | |

Amm-i-dent Tooth Powder consists of:

| | |
|---|---|
| Urea | 22.5% |
| Diammonium phosphate | 5.00% |
| Abrasive | 64.80% |
| Detergent | .5 % |
| Flavor | 2.2 % |
| Bentonite | 5.0 % |

These dentifrices were manufactured by Amm-i-dent, Inc. and distributed by Block Drug Co. as their licensee.

The plaintiff, by virtue of an assignment, is the owner of the Kesel Patent,[3] No. 2622058, hereinafter referred to as Kesel, and the Wach Patent, No. 2542886, hereinafter referred to as Wach. Amm-i-dent, Inc. is the licensee of Patent No. 254218, issued to Chester J. Henschel, (formerly defendant in this suit) hereinafter referred to as Henschel.

Kesel claim 1 reads as follows:

"1. A dentifrice comprising a non-toxic carrier adapted for oral administration and dibasic ammonium phosphate in proportion to provide under conditions of use in the mouth a concentration in the saliva sufficient to inhibit lactobacilli and being not substantially less than

2% of the composition, and a flavor masking ingredient."

Wach claim 6 provides:

"6. A dentifrice comprising a major portion of a non-toxic, non-sugary carrier adapted for oral administration, containing from 1 to 10 parts by weight of urea and from 1 to 7 parts by weight of a dibasic ammonium phosphate, there being at least 1% by weight of urea and at least 1% by weight of the phosphate present in said dentifrice."

Henschel claims read:

"1. A powdered dentifrice including the following ingredients in substantially the following proportions by weight:

| | Parts |
|---|---|
| Urea | 15 to 50 |
| Di-ammonium hydrogen phosphate | 7 to 4 |
| Abrasive | 71 to 34 |

"3. A dentifrice having as active ingredients, urea and diammonium hydrogen phosphate, the urea being by weight between 15 and 50 per cent by weight of the dentifrice and the diammonium hydrogen phosphate being 4 and 7 per cent by weight of the dentifrice."

These dentifrices are intended to reduce dental decay.

The cause of dental caries (dental decay) has been studied for a good many years. It has generally been an accepted theory that a bacterium, called lactobacillus acidophilus, is found in the saliva and is associated with decayed teeth. Dr. Robert Kesel began a study of the individuals whose teeth were decay resistent and those who were not. He graduated from the College of Dentistry of the University of Illinois in 1926, with a degree of D.D.S. and from the University of Illinois Medical School in 1931,

with respect to Amm-i-dent dentifrices, has agreed to indemnify Woolworth against any loss, damage, or expenses in connection with this action." See Esquire, Inc., v. Varga Enterprises, Inc., D.C., 81 F.Supp. 306, affirmed on this

point 7 Cir., 185 F.2d 14; Also see 69 C.J.S., Patents, § 339, p. 1071.

2. This is the same as dibasic ammonium phosphate.

3. Added to the complaint by amendment.

receiving an M.S. in Bacteriology. Since 1936 he has been head of the Department of Applied Materia Medica and Therapeutics of the College of Dentistry of the University of Illinois. From this study it was determined that there was an amount of ammonia in the saliva of caries inactive individuals which had the ability to inhibit lactobacilli, and that the amount was greater than normally produced by the breaking down of urea in the saliva. This indicated there was some source of ammonia in the mouth in addition to the salivary urea. Dr. Kesel's method was unusual. As early as 1941 or 1942 he and two of his students, Berry and Orland, all three being caries inactive, placed the incubated saliva of caries active individuals in their mouths. They found that the microorganism in the saliva they placed in their mouths disappeared. Even when sugar was added these organisms disappeared in 24 hours. This indicated there was something in their saliva which overcame this bacteria. They found this to be aerogenes bacteria which were capable of producing ammonia. A great deal of experimental work in vitro (in test tubes) with saliva was performed. The problem was then presented as to how to raise the ammonium content of the saliva of caries active individuals. Dr. Kesel had working with him Drs. Wach, Kirch, and O'Donnell, all of whom were connected with the College of Dentistry of the University of Illinois. They found that alkaline salts of ammonium when added to the saliva stimulated the aerogenes bacteria inhibiting lactobacillus, but that acid salts did not. They selected dibasic ammonium phosphate (hereinafter referred to as dibasic) as the preferred ammonium salt. From time to time in 1944 and 1945 patients with decayed teeth were referred to the group at the University of Illinois Dental School. It was found, with few exceptions, that patients who were administered dibasic had a lower lactobacillus count after three or four months use.

Sometime before the fall of 1945, Dr. Wach suggested the addition of urea to dibasic. In the fall of 1945 or early winter of 1946 tests were made using the combination of urea and dibasic. Their experimental work disclosed the supporting action between dibasic and urea. In the early part of 1948 in Peoria, Illinois began study on school children which lasted for about two years. The tests were made with a combination of dibasic and urea dentifrice.

Dr. Kesel appears to have been the spokesman of the group. He reported the findings to the Chicago Dental Society on February 13, 1946, including the test with dibasic dentifrice on some 55 individuals. This report was awarded the annual prize of the Chicago Dental Society for research investigation. He next read a paper October 9, 1946 at Palm Springs, California on the subject of "Ammonium Production of Oral Cavities and the Use of Ammonium Salts with Control of Dental Caries." In this paper printed in the Journal of Oral Surgery, Dr. Kesel explained the experiments using urea and dibasic. He gave further lectures before Dental Societies and wrote various articles on the experimental work that had been done.

Dr. Chester J. Henschel, a practicing dentist in New York City, delivered a paper in May, 1945 before the Westchester Dental Society and printed in the New York Journal of Dentistry in March, 1946 entitled "Caries Control by Chemical Prophylaxis" in which he submitted a formula containing urea for use in a liquid dentifrice. Dr. Henschel had been doing some work using a dentifrice with a very high urea content but found it irritating.

The defendants maintain:

A. That the plaintiff's patents are invalid for the following reasons:

1. Henschel patent is entitled to priority over the plaintiff's patents.

2. Kesel is invalid on the law of the case.

3. Both of the plaintiff's patents were anticipated by prior art.

4. The plaintiff's patents lack utility.

5. Kesel is invalid on the ground of double patenting or illegal extension of monopoly.

6. Wach lacks evidence of synergism of any such combination of urea and dibasic ammonium phosphate.

B. Defendants do not infringe.

■ There are certain applicable principles of law which must be recognized. A patent once issued is presumed to be valid. As to the defense of invalidity it is said,

" '[T]he burden of proof to make good the defense' is 'upon the party setting it up' and 'every reasonable doubt should be resolved against him'."

Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163. The presumption is strengthened where the prior art relied upon to invalidate the patent was considered and rejected by the patent office, but this is not conclusive. Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857. It is, therefore, plain that the burden of establishing the invalidity of the plaintiff's patent is upon the defendant. On the other hand the burden of proving infringement by a preponderance of the evidence is upon the plaintiff. Harries v. Air King Products Co., Inc., 2 Cir., 183 F.2d 158; Kalo Inoculant Co. v. Funk Bros. Seed Co., 7 Cir., 161 F.2d 981, reversed on other grounds 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588; 69 C.J. S., Patents, § 326, p. 1001.

■■ The first question with which this court is confronted, is priority of patent rights. This must be determined as a matter of fact. Sarnes v. Morley, D.C., 56 F.Supp. 735; Kislyn Corporation v. Eastman Kodak Co., D.C., 43 F. Supp. 552. It requires consideration of (1) the dates of the patents, (2) the dates of the applications, (3) the dates of actual reduction to practice, and (4) the dates of conception. Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 1 Cir., 166 F. 288; Corley v. Robinson, D.C., 3 F.Supp. 176; 69 C.J.S., Patents, § 87, page 383. The dates of the patents are: Henschel February 20, 1951; Wach February 20, 1951; and Kesel December 16, 1952. The dates of application, as shown on the patents are: Henschel February 27, 1947, Wach October 1, 1948, and Kesel July 7, 1952. However, Wach and Kesel both stem from the original application of Kesel, Joseph F. O'Donnell, Ernest R. Kirch, and Wach filed January 9, 1947. It was agreed between this group as shown by the file wrapper, that Wach was the sole inventor of a dentifrice using the combination of dibasic and urea, and that Kesel was the sole inventor of the dibasic dentifrice. After several amendments and narrowing of claims both Wach and Kesel issued on the original application of Kesel, et al. In this original application are two broad claims which fully cover the claims finally allowed in the patents: (a) "A dentifrice comprising as an essential ingredient dibasic ammonium phosphate." (b) "A dentifrice comprising urea, and a non-toxic, non acid salt of ammonia."[4] In a situation where the later applications refer back and are a continuation of the first application, the patent dates back to the time the original application was filed.[5]

■ The defendants lean upon the law applied in the patent office which

4. Page 18 of Kesel, et al. file wrapper.

5. The law was codified in the Patent Act of 1953, Sec. 120, Title 35, U.S.C.A. " '[A] continuing application is a development of an applicant's earlier application and which is entitled to the filing date of his earlier application for a constructive reduction to practice of the common embodiment of his invention in the two applications.' " Philip A. Hunt Co. v. Mallinckrodt Chemical Works, D. C., 72 F.Supp. 865, 872, affirmed 2 Cir., 177 F.2d 583, 586. This case holds that inasmuch as the first application was rejected for inadequate disclosure, and the invention was in use two years before the second application was filed,

they claim does not permit Kesel to rely on the filing date of the original application of January, 1947. The Board of Appeals did reject the Kesel claim in May and June of 1952. July 7, 1952 the final application was filed. The Examiner in his discretion[6] granted the patent and did not stand on the theory of the cases[7] cited by the defendants that the claims that were originally made were res adjudicata. Kesel did file a suit in equity under R.S. § 4915, 35 U.S.C.A. §§ 145, 146, but this was dismissed without hearing. Kesel was entitled to the filing date of his original application. Overland Motor Co. v. Packard Motor Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131; Keyes Fibre Co. v. Chaplin Corp., D.C., 97 F.Supp. 605, 609. Also see American Anode, Inc., v. Lee-Tex Rubber Products Corporation, 7 Cir., 136 F. 2d 581.

Both Kesel and Wach are entitled to priority over Henschel. Kesel was adopted to practice prior to the filing of the application. Wach's formula for dibasic and urea was used by Dr. McElroy, a practicing dentist in Chicago, in January, 1946. The dentifrice was supplied to him and prepared by Dr. Wach. This was prior to Dr. Henschel's application and his use of the combination.[8]

In addition there is evidence that Dr. Wach conceived the combination prior to January 16, 1946. Dr. Henschel attended the meeting in Chicago, Illinois, where Dr. Kesel delivered his paper before the Chicago Dental Society on February 13, 1946. Dr. Kirch, who was on the platform with Dr. Kesel, was approached after the meeting by Dr. Henschel who inquired whether work had been done using urea and dibasic. Dr. Kirch informed him that it had. After this date Dr. Henschel prepared a dentifrice of dibasic and urea and prescribed it for patients. There is no question but what Wach diligently reduced his conception to practice. Under such facts even if Dr. Henschel had reduced his dentifrices to practice prior to Dr. Wach, Dr. Wach was the first inventor. Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 34, 63 S.Ct. 1393, 87 L.Ed. 1731; Scharmann v. Kassel, 179 F.2d 991, 37 C.C.P.A., Patents, 903; 69 C.J.S., Patents, § 86(b) and cases cited therein.

This brings forward the next defense that the plaintiff's patents were anticipated by prior art. The defendants have cited 13 patents and 41 publications.[9]

Against Kesel the defendants rely principally upon the patents of McCall (1929), Detrie (French 1936, No. 803,-161), Cross (1934), and Janota (1946). McCall and Detrie were cited by the patent office in Kesel, Wach and Henschel. McCall uses less than 1% of ammonium carbonate in a dentifrice to reduce mouth

there cannot be a continuation of the first application. This case is distinguishable from the instant case because the original Kesel, et al. application explicitly and adequately discloses both dibasic and urea and dibasic as an invention. See B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 1 Cir., 122 F.2d 900, 913.

6. Minnesota Mining & Manufacturing Co. v. Coe, 79 U.S.App.D.C. 59, 143 F.2d 12.

7. In re Becker, 74 F.2d 306, 22 C.C.P.A., Patents, 843; In re Ellis, 86 F.2d 412, 24 C.C.P.A., Patents, 759.

8. The facts and circumstances corroborate Dr. Wach's reduction to practice. Dr. Kesel's testimony corroborates Dr. Wach. Also the laboratory notes of Dr. O'Donnell dated January 16, 1946, which were not admitted in evidence by over-sight, but referred to by both plaintiff and defendants in their briefs, and hereby considered in evidence by the court. It shows tests of 5% dibasic and 3% urea in vitro. This is corroborated by Dr. Kesel and the laboratory notes.

9. In United Chromium v. International Silver Co., D.C., 53 F.2d 390, 393, modified on other grounds, 2 Cir., 60 F.2d 913, certiorari denied, 288 U.S. 600, 53 S.Ct. 319, 77 L.Ed. 976, the court there said,

"But, inasmuch as a chemical action is involved here, analogy does not go a long way, because, while one can predict with confidence in mechanics in some instances, and in some cases where mathematics can be applied, in chemistry one almost entirely fails. In chemistry one cannot anticipate a result. A result may be obtained only by experiment."

acidity. Detrie used 80 parts of ammonium sesqui carbonate in a dentifrice to dissolve salivary tartar and mucin by restoring the alkalinity of the saliva. The defendants claim the Examiner was misled to believe that the ammonium sesqui carbonate in Detrie had an acid reaction. Before the same Examiner in Henschel it is plainly shown that the Examiner knew it had an alkaline reaction.[10] McCall disclosed insufficient amounts of ammonium carbonate to anticipate Kesel. Cross used less than 4.2 of sodium phosphate in a dental preparation. Sodium phosphate may be distinguished from the more stable phosphate, dibasic ammonium phosphate. Sodium phosphate-Monobasic consists of $NaH_2PO_4$,[11] whereas, the formula for dibasic ammonium phosphate is $(NH_4)_2HOP_4$. There is also disodium phosphate and trisodium phosphate. No suggestion is made in the patent as to which of these is to be used. Janota speaks of using sodium potassium and ammonium.[12] It also speaks of pyrophosphates. There is nothing definite in these terms which would teach the use of dibasic ammonium phosphate. It must be observed that Kesel taught the inhibition of lactobacillus and the stimulation of the aerogenes bacteria to get a natural production of ammonia to maintain tooth integrity. All of these patents were referred to by the same Examiner in either Kesel, Wach, or Henschel.

The publications relied upon principally as anticipating Kesel are Lichtenstein, Grove and Grove, Kesel, and Stephan. Dr. Edith Lichtenstein published a thesis in 1924 in which she found a relationship between the ammonia content of the saliva and dental caries. The defendants urge that this thesis suggests the introduction of neutralizing salts in the saliva. This court comes to no such conclusion. All Lichtenstein does is to confirm the relationship between the ammonia content in the saliva and immunity from dental caries.

Grove and Grove conducted experiments on immunity and susceptibility to dental caries and published papers on the subject between 1934 and 1942. As early as 1934 Groves' paper emphasized that where the pH of saliva is above 7 there are alkaline ammonium salts present capable of being an immunizing force against caries.[13] Grove and Grove recommended .006% of 1% of ammonium. It was proven that such amount has no effect. The defendants have also relied upon the Kesel paper of 1945 as an anticipation of Kesel. "Deamination of Amino Acids by the Human Oral Flora; Its Role in Dental Caries Immunity." Defendants' Exhibit 4D–20. This was cited, as was Grove, before the same patent examiner. It does not disclose a formula for a dentifrice.

Dr. Stephan et al. published an article in February, 1944 on the effect of urea upon lactobacilli.[14] He experimented from .01% to 50% of urea and reported on the pH of placques material in 1943. The defendants claim this is anticipatory as urea breaks down in the mouth to ammonia. The Examiner was familiar with Stephan's work. Nowhere does Stephan suggest the use of urea to stimulate the aerogenes bacteria, nor does he teach the use of dibasic. Dr. John B. Lewis, Director of Research of Amm-i-dent, Inc., recognized that the use of both Kesel and Wach dentifrices promoted the growth of an organism

10. Pages 12 and 28 of the Henschel file wrapper. See also page 23 original file wrapper of Kesel, et al.

11. Merck's Index (4th Edition) page 481. Monobasic-solution acid to litmus.

12. Lines 9 and 10 second column of Janota patent.

13. "The Biochemical Aspect of Dental Caries" Vol. 76, Dental Cosmos, Oct. 1934, the pH considered neutral as between alkaline and acid content. (Phenolphthalein indicator.) Defendants Exhibit 4P—Item 11.

14. Defendants' Exhibit 4P—Item 13. Stephan and Miller. "Effectiveness of Uses and of Synthetic Detergents in reducing Activity of Human Dental Caries." Cited against Kesel, Wach, and Henschel.

which had an inhibitory effect referred to as bacterium lactic aerogenes.[15]

As against Wach the defendants press these patents as anticipatory: Meiser (1934) 9,951,581; Jones (1948) 2,452,054, (using a priority of 1944). Jones was cited. Meiser was referred to by the same Examiner in Henschel.[16] It is for a fertilizer. It certainly is not analogous art and could not be anticipatory of a dentifrice. See Copeman Laboratories Co. v. General Plastic Corp., 7 Cir., 149 F.2d 962; General Metals Powder Co. v. S. K. Wellman Co., 6 Cir., 157 F.2d 505, certiorari denied 329 U.S. 812, 67 S.Ct. 632, 91 L.Ed. 693; Nordberg Mfg. Co. v. Woolery Machine Co., 7 Cir., 79 F.2d 685. See also 69 C.J.S., Patents, § 23, p. 202, and cases cited therein at note 83. For the same reason Jones may be equally discarded as it pertains to a fire extinguisher.

The publications upon which main reliance is placed to anticipate Wach is Stephan and Grove & Grove. The 1944 publication of Stephan was cited and discarded. The Examiner was familiar with all of Stephan's publications as shown by the file wrapper of Kesel, Wach, and Henschel. It has been discussed as to its anticipatory effect upon Kesel. For the same reasons it is not anticipatory of Wach. Dr. Henschel cited Grove & Grove in his paper of 1945. It had not suggested to him the use of dibasic.

The defendants next insist that the plaintiff has failed to show that either Kesel or Wach have utility.[17] Neither of these patents claim to be a cure-all for tooth decay but both show a progress in solving a health problem. Kesel experimented with dibasic dentifrice on some 55 individuals who were referred to him. With a few exceptions these patients were aided by the use of dibasic dental compound. Defendants insist that dibasic has no effect on lactobacillus and it is most doubtful that lactobacillus has any relationship with dental caries. This is a strange argument inasmuch as Henschel also teaches the inhibition of lactobacillus.

In 1948, the University of Illinois appropriated $50,000.00 to study the effect of ammoniated dentifrices on the teeth of children in Peoria and Aurora.[18] The dentifrice used in the Peoria study contained 3% urea and 5% dibasic. The clinical survey was conducted by the Department of Public Health, State of Illinois. Statistics were tabulated by reputable statisticians employed by this Department. The results showed a 16 to 17% reduction in caries among children using the ammoniated dentifrice. The defendants have attacked the validity of these statistics and the method used, but this evidence is not convincing. The defendants have offered ex parte experiments to show the non utility of Wach. Such experiments have little weight.[19] If partial success was obtained, and this

15. Page 37 Henschel file wrapper at page 42.

16. Artmoore v. Dayless Mfg. Co., Inc., 7 Cir., 208 F.2d 1, 4. "It has been held * * * that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked."

17. This is refuted in Henschel. "The soluble salt as expected acts immediately whereas urea is slow and prolonged." Henschel file wrapper at page 17.

18. No analysis on Aurora.

19. In re Donner v. Walgreen Co., 7 Cir., 44 F.2d 637, 642, Judge Lindley, "De-

fendant introduced the testimony of certain experts who made experiments ex parte. Unfortunately the strict teachings of the formulae and the Donner Patent were not followed, and there is little to enlighten the court, therefore, in the testimony as to the same. The courts place little weight on ex parte demonstrations in any case, but especially is this true with regard to experiments with chemicals. Kuehmsted v. Farbenfabriken Co., 7 Cir., 179 F. 701."

Cross Examination of Lois C. Lillick, B.S. M.A. M.D. and Ph.D. in bacteriology, plainly illustrates the unreliability of ex parte experiments.

was certainly proven by plaintiff, it is sufficient evidence of utility. Emery Industries, Inc., v. Schumann, 7 Cir., 111 F.2d 209.

■ The defendants argue that since Kesel issued after Wach there is double patenting or the illegal extension of monopoly. Where, as here, there are two separate inventors even if the two patents were assigned to the plaintiff there is not double patenting. Federal Telephone & Radio Corp. v. Associated Tel. & Tel. Co., D.C., 99 F.Supp. 535; Waterbury Buckle Co. v. G. E. Prentice Mfg. Co., D.C., 294 F. 930.

■ The defendants stress that Wach consist of a combination of two old elements, dibasic and urea, and that it is invalid because there is no evidence that these elements have cooperating effect in the mouth to merit invention. First, it is questionable whether synergism must be proved to obtain a patent on such a chemical compound. Our Supreme Court indicated this in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162.

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics."

Also see Diversey Corporation v. Mertz, D.C., 13 F.Supp. 410. But the

evidence here discloses that there is synergistic action.[20] Both Henschel and Wach[21] indicated that dibasic acts immediately and urea latently.

Arnold J. Singer, D.D.S., employed by Block Drug as Director of Research in their laboratories stated under oath:

"Much less activity exists with lower concentrations of urea. A solution containing 5% diammonium hydrogen phosphate and 3% urea has only slightly more activity than diammonium hydrogen phosphate alone and the pH of the tooth returns to its normal level within 20 to 40 minutes whereas the high urea concentration keeps the pH elevated for more than 2 hours." (Henschel file wrapper at page 110.)

Dr. Singer here admits there is some synergism in Wach and more so in Henschel or Amm-i-dent. Dr. Lewis also found synergistic action in the use of 4% urea and 1% dibasic. (Page 41 of Henschel file wrapper.) This was within the Wach claim.

■ This court concludes there is invention and utility in the plaintiff's patents. If there were doubt, the plaintiff has shown commercial success. Licenses were issued by the plaintiff to Colgate, Pepsodent, the manufacturers of Ipana, Dr. Lyon's, Kolynos, Walgreen's, Rexall, and McKesson and Robbins. Commercial success is evidence of utility and invention. See on invention—Smith v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 81 L.Ed. 1049. On Utility—Flintkote Co. v. National Asbestos Mfg. Co., 3 Cir., 52 F.2d 719, 721.

■ The final proposition is then presented. Does Amm-i-dent infringe

20. At page 35 of Henschel file wrapper. "Submission of detailed laboratory reports on this point would seem to be superfluous, particularly since the synergistic effect was subsequently confirmed by later workers in art, see page 100 of Kesel's report, Vol. 33, No. 2, compare Line E of Table V and Line D of Table IX, with Line D of Table XIII."

21. Dr. Karshan attempted to discredit Wach's finding of synergism shown in the

Wach Tables by giving his opinion that there was no synergism at 4 hours, which he claimed is the closest to conditions in the mouth. He admitted that he personally had not made lactic acid determinations in saliva. This is a different situation from Hoover, v. Eckerd's Cut Rate Medicine Co., Inc., D.C., 53 F.2d 215, 217, affirmed 3 Cir., 63 F.2d 813, 814.

Wach and Kesel? The issue of infringement is a question of fact. Faulkner v. Gibbs, 9 Cir., 170 F.2d 34, 37, affirmed 338 U.S. 267, 70 S.Ct. 25, 94 L.Ed. 62. The Wach claim covers the defendants' dentifrice like a blanket. The defendants argue that Wach calling for 1 to 10 parts by weight of urea and from 1 to 7 parts by weight of ammonia should be read as limiting the claim to a formula of not more than 10% of urea. The use of the words "at least 1% by weight of urea and at least 1% by weight of the phosphate present in the dentifrice" would have to be ignored to accomplish the defendants' aim. It is clear that Wach claims 1 to 10 parts by weight of urea in proportion to 1 to 7 parts by weight of dibasic. The defendants use 4⅓ to 4½ parts by weight of urea to dibasic which is plainly within the claim of Wach.

■ The defendants further contend that the specifications must be read into the Wach claim to refute the use of over 10% urea. A patentee is limited by the express terms of his claims. Resort to the specifications to narrow or enlarge a claim may not be done unless the claim is ambiguous. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097. The Wach claim is not ambiguous.

In any event Wach does not disclaim in his specifications the use of large percentages of urea. Wach, Col. 6, suggests a preferred formula for a mouth rinse and a tooth powder. In both of these he was speaking of 5 parts to 3 parts by weight. In the same column Wach states:

"The amount of urea, however, should not exceed substantially the amount of the ammonium compound, and the amount of the ammonium compound should not be substantially over three times the amount of the urea where the synergistic effect is desired. * * * Obviously if a large proportion of dentifrice is used, the percentage of the urea and ammonium compound may be reduced. If the amount of urea is made too great, however, it is difficult to mask its taste. It is, therefore, *preferred* that the amount of urea should not exceed 10%. * * * The proportion of ammonium phosphate should not normally be above 6 to 7%. * * * In any event the ammonium compound and the urea are used in therapeutic concentrations in the dentifrice that are sufficient in a normal dentifrice dosage to provide a concentration in the saliva of the mouth that will be inhibitory to the production of the Lactobacillus Acidophilus." (Emphasis supplied.)

Clearly defendants have strained and failed to find in these specifications a disclaimer of more than 10% urea, although it does state the 5 and 3 proportion is preferred.

Intermingled with other arguments in defendants' brief and appendix of 290 pages is the contention that Amm-i-dent is a high urea dentifrice and should not be accused of infringement. This contention was exploded by Dr. Henschel. He said,

"I would like to see a stop to the phrase 'high' urea right here and now. Just because it is almost meaningless. * * *

"[T]he human body can easily tolerate up to 5% of urea all over the body, and the mouth is no different. * * *

"So that it is not a question of high urea. It is not high urea. The so-called high urea formula is a pretty low urea when it is actually used. * * *

"You see, if you analyze the material which is presented to you, you will see that Dr. Kesel's published work was with using concentrations which were quite similar, if not higher, than my percentages. They

are not low. They are higher if anything." [22]

The defendants insist that the plaintiff is estopped to claim infringement of Wach because the claims were contracted as a result of the Jones and Meiser patents. These patents have been discussed and discredited as prior art. Wach originally had a claim which read:

"A dentifrice comprising from 1 to 7 parts of dibasic ammonium phosphate, 1 to 10 parts of urea and an inert non-sugary carrier adapted for oral administration." Page 25 of Wach file wrapper.

This claim in its final form reads as claim 6 and is sufficiently broad as amended to cover Amm-i-dent.[23] A fair and reasonable interpretation of the Wach claim covers Amm-i-dent. I find nothing in the Wach file wrapper where Wach was estopped by any arguments made by counsel as against Amm-i-dent.[24]

The defendants have infringed Kesel. It claims:

"A dentifrice comprising a nontoxic carrier * * * and dibasic ammonium phosphate in proportion to provide under conditions of use in the mouth a concentration in the saliva sufficient to inhibit lactobacilli and being no substantially less than 2% of the composition and a flavor masking ingredient."

Another claim expressly asserts 2 to 5% dibasic. Amm-i-dent contains 3%

and 5% dibasic. Amm-i-dent is manufactured under Henschel. Henschel's purpose is expressed in his patent:

"It is among the objects of the invention to provide a dentifrice which promptly and efficaciously inhibits the action of the Lactobacillus, * * * and which dentifrice performs various other functions looked for in such commodity and has no toxic action and no objectionable taste."

It is clear that both are ammoniated dentifrices to reduce tooth decay by inhibiting lactobacilli. Defendants argue that Kesel does not inhibit lactobacilli and could not be infringed. The evidence corroborates Kesel. Dr. Arnold J. Singer and Dr. John B. Lewis in their affidavits [25] in the Henschel file wrapper, and Dr. Henschel in his patent verify that dibasic does inhibit lactobacilli. Dr. Murray J. Rosenthal, Director of Research of Block Drug Company, in his experiments made the same finding. The adding of urea in Amm-i-dent does not radically change its operation and character to void infringement. Haynes Stellite Co. v. Chesterfield, 6 Cir., 22 F. 2d 635; A. S. Boyle Co. v. Siegel Hardware & Paint Co., D.C., 26 F.Supp. 217, 226; Drumhead Co. of America v. Hammond, D.C., 18 F.Supp. 734, affirmed 3 Cir., 89 F.2d 241; Diversey Corporation v. Mertz, D.C., 13 F.Supp. 410; I. F. Laucks, Inc., v. Kaseno Products Co., D.C., 59 F.2d 811, reversed in part on other grounds, Chas. H. Lilly Co. v. I. F. Laucks, Inc., 9 Cir., 68 F.2d 175, cer-

22. Defendants' Exhibit 4P, item 34, page 79.

23. Hubble v. United States, 179 U.S. 77, at page 90, 21 S.Ct. 24, at page 25, 45 L. Ed. 95, the court said: "It is quite true, that, where the differences between the claim made and as allowed consist of mere changes of expression, having substantially the same meaning, such changes, made to meet the views of the examiners, ought not to be permitted to defeat a meritorious claimant. While not allowed to revive a rejected claim by a broad construction of the claim allowed, yet the patentee is entitled to a

fair construction of the terms of his claim as actually granted." See New York Scaffolding Co. v. Whitney, 8 Cir., 224 F. 452. Hutzler Bros. Co. v. Sales Affiliated, Inc., 4 Cir., 164 F.2d 260, 267; Hunt v. Armour & Co., 7 Cir., 185 F. 2d 722, 727.

24. "[I]t is well settled that mere arguments of an applicant for a patent have no bearing on that question; * * *" (Limiting the scope of the claim.) York Ice Machinery Corporation v. L & K Ice Corporation, D.C., 6 F.Supp. 544, 546.

25. Dr. Lewis's affidavit p. 37 and Dr. Singer's affidavit p. 101.

tiorari denied I. F. Laucks, Inc. v. Chas. H. Lilly Co., first case, 293 U.S. 573, 55 S.Ct. 84, 79 L.Ed. 671, reversed in part on other grounds, Chas. H. Lilly Co. v. I. F. Laucks, Inc., 9 Cir., 68 F.2d 190, certiorari denied I. F. Laucks, Inc., v. Chas. H. Lilly Co., second case, 293 U.S. 573, 55 S.Ct. 84, 79 L.Ed. 671. The defendants cite American Chemical Paint Co. v. Firestone Steel Products Co., 6 Cir., 117 F.2d 927, but in that case the elements added were clearly shown to result in a different compound.

There is additional evidence of infringement. The "Reader's Digest", February, 1949 issue, carried a condensed article from "Better Homes & Gardens." The title was "New Brush-off for Dental Decay." It extols the value of the use of ammoniated dentifrice. In a footnote it identified "Amurol" as an ammoniated tooth powder accepted by American Dental Association and manufactured under license of the University of Illinois Foundation. Amm-i-dent was then advertised to gain the benefit of this publicity, by direct reference to the "Reader's Digest" article. It was stated in advertisements "Amm-i-dent contains carbamide (synthetic urea) and dibasic ammonia phosphate. Amm-i-dent cuts down Lactobacillus Acidolphilus, a major cause of tooth decay. Amm-i-dent is pleasantly flavored." Later advertisements[26] were worded. "Amm-i-dent—The Ammoniated Tooth Paste." "Amm-i-dent Reduces Tooth Decay." Defendants were obviously commending Amm-i-dent as an ammoniated dentifrice functioning the same as Wach and Kesel. This manifested infringement. Wheatley v. Rex-Hide, Inc., 7 Cir., 102 F.2d 940, 942. Gibbs v. Triumph Trap Co., Inc., 2 Cir., 26 F.2d 312, 314.

The patent office may have made a mistake in not having an interference hearing. So far as this court is concerned it would have avoided this litigation. The plaintiff did claim Amm-i-

dent infringed.[27] However, in no event is the lack of an interference hearing conclusive on non-infringement. Herman v. Youngstown Car Mfg. Co., 6 Cir., 191 F. 579, 586; Ashley v. Weeks-Numan Co., 2 Cir., 220 F. 899, 903. Also see Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, 63; West v. Premier Register Table Co., 1 Cir., 27 F.2d 653, 656.

The court, therefore, concludes that the plaintiff's patents are valid and have been infringed, but the plaintiff is not entitled to treble damages. Since defendants obtained an assignment of Henschel and acted upon the advice of counsel, the defendants did not willfully and wantonly infringe. Artmoore v. Dayless Mfg. Co., Inc., 7 Cir., 208 F.2d 1, certiorari denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075.

Plaintiff may submit findings of fact, conclusions of law, and order in conformance with the views expressed herein.

---

26. Plaintiff's Exhibits 23, 25, 35, 56, and 58 were published after February 20, 1951 (date of Wach patent) and Plaintiff's Exhibits 19, 70, and 71 were before.

Later advertisements did not refute inhibition of lactobacilli.

27. Wach file wrapper page 121.