The **UNIVERSITY OF ILLINOIS FOUN-DATION, Plaintiff-Appellee,**

v.

**BLOCK DRUG CO., Amm-i-dent, Inc., and F. W. Woolworth Co., Defendants-Appellants.**

**No. 11605.**

United States Court of Appeals Seventh Circuit.

Jan. 16, 1957.

Rehearing Denied Feb. 18, 1957.

Benjamin B. Schneider, Chicago, Ill., Robert S. Dunham, William R. Liberman, New York City, Robert L. Broderick, East St. Louis, Ill., and R. Howard Goldsmith, Chicago, Ill., for appellants. Schneider, Dressler & Goldsmith, Chicago, Ill., of counsel.

Charles J. Merriam, Chicago, Ill., Harold G. Baker, East St. Louis, Ill., Robert F. Monaghan, Hugh M. Matchett, John Rex Allen, Chicago, Ill., for appellee. Merriam & Lorch, Chicago, Ill., of counsel.

Before MAJOR, FINNEGAN and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

This is an action alleging infringement of two patents: No. 2,542,886, entitled "Dentifrice," granted February 20, 1951, to Edward C. Wach, and No. 2,622,-058, entitled "Ammoniated Dentifrice," granted December 16, 1952, to Robert G. Kesel. (The former will hereinafter be referred to as the Wach and the latter as the Kesel patent.) Plaintiff, The University of Illinois Foundation, acquired the patents by assignment from Wach and Kesel. Both patents relate to dentifrice compositions intended to prevent dental caries, or tooth decay, or to inhibit the development of a particular

organism, lactobacillus acidophilus, usually present in human saliva.

Defendant F. W. Woolworth Co. was charged with infringement by the sale at its store in East St. Louis, Illinois, of tooth paste and tooth powder under the name of "Amm-i-dent," which allegedly embodies the inventions of the patents in suit. Defendant Amm-i-dent, Inc. was charged with the manufacture of Amm-i-dent which it sold to defendant Block Drug Co., who in turn made distribution to the retail trade, including defendant Woolworth.

A patent was issued to Chester J. Henschel February 20, 1951 (the same date as the issuance of the Wach patent), entitled "Dentifrice." Henschel licensed the manufacture and sale of Amm-i-dent by defendants Amm-i-dent, Inc. and Block. During the course of the proceeding the suit was dismissed as to Henschel who originally was made a party-defendant.

Defendants relied upon the defenses of invalidity and non-infringement. Invalidity was asserted because (1) Henschel's patent is entitled to priority over plaintiff's patents, (2) plaintiff's patents are anticipated by the prior art or, in any event, do not show invention in view of such art, and (3) plaintiff's patents are without utility. The District Court, after a long trial in which a voluminous record was made, rendered an opinion in which all material issues were discussed and decided adversely to defendants. Following such opinion and in conformity therewith, the Court entered its findings of fact and conclusions of law, and on August 4, 1955, its decree sustaining the validity of both patents, as well as the charge of infringement by defendants. From this decree defendants appeal.

In this Court defendants contend (1) that both the Kesel and Wach patents are invalid, and (2) that even though the validity of Wach be sustained, there is no infringement by defendants. The utility of the product manufactured in accordance with the teachings of Kesel and Wach is conceded and no issue is raised here but that defendants infringe Kesel, if valid.

The problem with which the dental profession was concerned and to which the patents in suit relate was dental decay. The opinion of the District Judge contains a statement concerning the problem confronting the profession, as well as the work done by the patentees, Dr. Kesel and Dr. Wach, about which there seems to be no controversy and which we adopt. (This includes the three paragraphs which immediately follow.)

The cause of dental caries (dental decay) has been studied for a good many years. It has generally been an accepted theory that a bacterium, called lactobacillus acidophilus, is found in the saliva and is associated with decayed teeth. Dr. Robert Kesel began a study of the individuals whose teeth were decay resistant and those whose teeth were not. He graduated from the College of Dentistry of the University of Illinois in 1926, with a degree of D.D.S. and from the University of Illinois Medical School in 1931, receiving an M.S. in Bacteriology. Since 1936 he has been head of the Department of Applied Materia Medica and Therapeutics of the College of Dentistry of the University of Illinois. From this study it was determined that there was an amount of ammonia in the saliva of caries inactive individuals which had the ability to inhibit lactobacilli, and that the amount was greater than normally produced by the breaking down of urea in the saliva. This indicated there was some source of ammonia in the mouth in addition to the salivary urea. Dr. Kesel's method was unusual. As early as 1941 or 1942 he and two of his students, Berry and Orland, all three being caries inactive, placed the incubated saliva of caries active individuals in their mouths. They found that the micro-organism in the saliva they placed in their mouths disappeared. Even when sugar was added these organisms disappeared in 24 hours. This indicated there was something in their saliva which overcame this bacteria. They found this

to be aerogenes bacteria which were capable of producing ammonia. A great deal of experimental work in vitro (in test tubes) with saliva was performed. The problem was then presented as to how to raise the ammonium content of the saliva of caries active individuals. Dr. Kesel had working with him Drs. Wach, Kirch and O'Donnell, all of whom were connected with the College of Dentistry of the University of Illinois. They found that alkaline salts of ammonium when added to the saliva stimulated the aerogenes bacteria inhibiting lactobacillus, but that acid salts did not. They selected dibasic ammonium phosphate (hereinafter referred to as dibasic) as the preferred ammonium salt. From time to time in 1944 and 1945, patients with decayed teeth were referred to the group at the University of Illinois Dental School. It was found, with few exceptions, that patients who were administered dibasic had a lower lactobacillus count after three or four months' use.

Sometime before the fall of 1945, Dr. Wach suggested the additional use of urea. In the fall of 1945 or early winter of 1946, tests were made using the combination of urea and dibasic. Their experimental work disclosed the supporting action between dibasic and urea. In the early part of 1948, in Peoria, Illinois, they began study on school children which lasted for about two years. The tests were made with a combination of dibasic and urea dentifrice.

Dr. Kesel appears to have been the spokesman of the group. He reported the findings to the Chicago Dental Society on February 13, 1946, including the test with dibasic dentifrice on some 55 individuals. This report was awarded the annual prize of the Chicago Dental Society for research investigation. He next read a paper October 9, 1946, at Palm Springs, California, on the subject of "Ammonium Production of Oral Cavities and the Use of Ammonium Salts with Control of Dental Caries." In this paper printed in the Journal of Oral Surgery, Dr. Kesel explained the experiments using urea and dibasic. He gave

further lectures before Dental Societies and wrote various articles on the experimental work that had been done.

The labors and efforts of Drs. Kesel and Wach culminated in the issuance of the Kesel and Wach patents in suit. During substantially the same period, Dr. Chester J. Henschel, a practicing dentist in New York City and Chief of Dentistry at Sydenham Hospital in New York, was also interested in the same problem and his efforts culminated in the issuance of a patent to him under which defendants are licensed to manufacture and sell "Amm-i-dent."

The Kesel patent contains five and the Wach patent eight claims. Claim 1 of Kesel and Claim 6 of Wach appear to be recognized as typical. The former reads as follows:

"A dentifrice comprising a nontoxic carrier adapted for oral administration and dibasic ammonium phosphate in proportion to provide under conditions of use in the mouth a concentration in the saliva sufficient to inhibit lactobacilli and being not substantially less than 2% of the composition, and a flavor masking ingredient."

The latter reads as follows:

"A dentifrice comprising a major portion of a non-toxic, non-sugary carrier adapted for oral administration, containing from 1 to 10 parts by weight of urea and from 1 to 7 parts by weight of a dibasic ammonium phosphate, there being at least 1% by weight of urea and at least 1% by weight of the phosphate present in said dentifrice."

Claim 1 of the Henschel patent, which appears to be typical of its four claims, reads as follows:

"A powdered dentifrice including the following ingredients in substantially the following proportions by weight:

|  | *Parts* |
|---|---|
| Urea | 15 to 50 |
| Di-ammonium hydrogen phosphate | 7 to 4 |
| Abrasive | 71 to 34" |

Defendant Woolworth sold Amm-i-dent both in powder and paste form. Insofar as material to the instant case, the former contained 22.5% urea and 5% di-ammonium phosphate. The latter contained 13% urea and 3% di-ammonium phosphate.

Defendants, without attacking any specific finding of the trial Court, present their case here as though it were a trial *de novo*. An attempt is made to justify this course on the theory that on both the issues of validity and infringement nothing is involved but a consideration of the prior art and statements of the patentees, together with parol evidence explanatory of the prior art. It is contended that such matters "may therefore be considered by this court notwithstanding the findings of the trial court." In support of this premise defendants rely upon three decisions of this Court: Sales Affiliates, Inc. v. National Mineral Co., 7 Cir., 172 F.2d 608, 613, certiorari denied 337 U.S. 940, 69 S.Ct. 1516, 93 L.Ed. 1745; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802, certiorari denied 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340, and Falkenberg v. Golding, 7 Cir., 195 F.2d 482, 486.

A reading of these cases readily discloses that they are without application to the instant situation where there was a large amount of so-called prior art, most of which was couched in highly technical language the meaning and significance of which formed the basis for much controversy. There was marked conflict among the expert witnesses as to the teachings of the prior art, as well as its application or relevancy to the problem with which the dental profession was confronted and which Kesel and Wach sought to alleviate. The case is clearly one which calls for the application of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which provides, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." This

Court in O'Brien v. O'Brien, 202 F.2d 254, 255, made a statement particularly pertinent and applicable to the instant situation, and which we think bears repeating, as follows:

"The District Court made extensive findings of fact, both on the issue relating to invention and that of infringement. A reading of the testimony, particularly that of the expert witnesses, is convincing that the record furnishes substantial support for such findings. True, there is evidence favorable to defendant's theory of the case, at least on certain subsidiary issues, but even though we assume that such testimony would support findings in his favor, we are still faced with the fact that the court in its judgment chose to make findings predicated upon testimony favorable to the plaintiff. Under such circumstances, is it the function of this court to ignore such findings and to make an independent analysis and determination of the issues in controversy? We think the answer is no."

Relative to the limited function of a reviewing court under the instant circumstances, see also Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L. Ed. 672, and 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Hazeltine Research, Inc. v. Admiral Corp., 7 Cir., 183 F.2d 953, and Weller Mfg. Co. v. Wen Products, Inc., 7 Cir., 231 F.2d 795.

Thus, in reality the issues here are not merely those of invention and infringement but whether this Court can say that the findings of the District Court on these issues are clearly erroneous. In addition, this Court, as did the District Court, must take into consideration the axiomatic rule that a patent from the fact of issuance is presumed to be valid. Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163, and as this Court stated in Lewyt Corp. v. Health-Mor, Inc., 181 F.2d 855, 857, " * * * this presumption is strength-

ened in a case where, as here, the prior art relied upon to invalidate the patent was considered and rejected by the patent office."

We think that no good purpose could be served in an attempt on our part to analyze and dissect the voluminous exhibits relied upon as prior art. They consist of many patents, none of which were ever reduced to practice so far as we are aware, as well as numerous articles and publications prepared by the patentees and other high-ranking members of the dental profession. An analysis of such art is in a field for experts, not laymen. The District Court heard the explanatory testimony of experts and found that the patents were not anticipated by the prior art. We find no reason to disagree; certainly we cannot say that such a finding is clearly erroneous. In this connection, defendants contend that all the prior art was not cited in the prosecution of the applications which culminated in the granting of the patents in suit. Four publications are included in this category, an article by Grove and Grove, two articles by Stephan and one by Dr. Kesel. A study of these articles reveals nothing which reflects upon the validity of the patents; in fact, we suspect they were not cited by the Examiner because of immateriality.

In addition to the presumption attaching to the grant and the findings of the District Court, there are other criteria which support patentable invention. As already noted, none of the prior art was reduced to commercial practice and this in spite of the long-felt want for a dentifrice which would aid in the elimination of tooth decay. The statement of this Court in Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404, appears to be appropriate:

"The prior art upon which defendant now lavishes its praise was apparently permitted to lie dormant until the exigency, created by a suit for infringement, required its resurrection."

It is true, as defendants point out, that prior art, even though not reduced to practice, may be utilized to anticipate. Even so, however, we think its use for that purpose under existing circumstances is greatly impaired. Also as noted, defendants concede the utility of the product manufactured in accordance with the teachings of the Kesel and Wach patents. Not only were their teachings reduced to practice, but the product enjoyed great commercial success. Some thirty dentifrice manufacturers have been licensed under these patents, including such leaders in the industry as Colgate, Ipana, Pepsodent, Kolynos, Walgreen and Amurol. Another significant factor relative to the prior art is the derogatory appraisement which Dr. Henschel made of it during the course of the proceedings which resulted in the issuance of his patent.

In our view, the most serious question arises from defendants' contention that defendants' alleged infringing products were on the market long before Kesel's disclosure in the Patent Office upon which his claims were allowed. If this contention is sound, it means, of course, that Henschel was entitled to priority over Kesel, which would result in the invalidation of the latter's claims. As already shown, both the Wach and Henschel patents issued February 20, 1951, while the Kesel patent did not issue until December 16, 1952. The important date on the question of priority, however, is that of disclosure, not that of issuance.

Both Kesel and Wach stem from an original application, Serial No. 721,156, filed January 9, 1947, in the names of Kesel, Wach, O'Donnell and Kirch (referred to as the parent application). Some claims called only for dibasic, others for urea plus dibasic. The Patent Office held that there were claims to more than one species and required the applicants to make an election. As a result, Kesel claimed to be the inventor of the dibasic ammonium phosphate dentifrice, and Wach, the inventor of the combination of such dibasic and urea.

Thereupon, separate "continuation-in-part" applications were filed October 1, 1948, in the names of Kesel and Wach individually. Kesel's claims were rejected on the prior art, and they were amended from time to time primarily on the Examiner's holding that the proof of utility was not sufficient. On appeal, the claims were held unpatentable by the Board of Appeals, and Kesel appealed to the District Court. The matter was not pursued in court, however, because on July 7, 1952, Kesel filed a second "continuation-in-part" application, with amended specifications and with some change in the phraseology of the claims. It was upon this third application that the patent finally issued.

The District Court reviewed the facts on the issue of priority and in its opinion stated [133 F.Supp. 584]:

"In this original application are two broad claims which fully cover the claims finally allowed in the patents: (a) 'A dentifrice comprising as an essential ingredient dibasic ammonium phosphate.' (b) 'A dentifrice comprising urea, and a non-toxic, non acid salt of ammonia.' In a situation where the later applications refer back and are a continuation of the first application, the patent dates back to the time the original application was filed."

The Court also stated [133 F.Supp. 585]:

"Both Kesel and Wach are entitled to priority over Henschel. Kesel was adopted to practice prior to the filing of the application. Wach's formula for dibasic and urea was used by Dr. McElroy, a practicing dentist in Chicago, in January, 1946. The dentifrice was supplied to him and prepared by Dr. Wach. This was prior to Dr. Henschel's application and his use of the combination."

Further, the Court found as a fact that both Kesel and Wach were entitled to priority over Henschel, and specifically (referring to Kesel):

"The final application of July 7, 1952 was entitled to the filing date of the earlier application as to all common subject matter."

We discern no reason to disagree with the District Court either upon its reasoning or finding relative to the issue of priority, and we approve. It is fortunate that we are not required to solve the puzzling situation arising from the proceedings in the Patent Office. Kesel and Wach (particularly the former) appear to have been engaged in a race with Henschel, the goal of which was to obtain the prior issuance of a patent. As shown, the parent application of Kesel and Wach was filed January 9, 1947, while Henschel's application was filed February 27 of the same year. Wach and Henschel issued on the same date, February 20, 1951, while Kesel did not issue until December 16, 1952. Thus, for the same period of some four or five years, all three applications were under consideration. All traveled a rugged road and met sturdy resistance from the Examiner in view of the prior art, all deprecated the prior art as being useless, and finally, it appears, convinced the Examiner of the soundness of their contentions on this score. It appears to us that the issue of priority should have been determined in an interference proceeding rather than leaving it to the courts. Obviously, such a determination would have avoided expensive and time-consuming litigation. In this connection plaintiff contends, with some plausibility, that the issuance of the Kesel patent constitutes a recognition by the Patent Office of a prior disclosure and use by Kesel dating back to the time of the filing of the parent application.

We now come to defendants' contention that the claims of the Wach patent are invalid. Much of what we have heretofore said relative to Kesel is pertinent as to Wach and need not be repeated. As the claims (heretofore set forth) disclose, Kesel called for a dentifrice the essential component of which was dibasic ammonium phosphate (called dibasic), while the claims of Wach called for urea in connection with and in addition to the dibasic of Kesel. It must be

admitted, we think, that the question is whether the addition of urea to the compound disclosed by Kesel constituted an improvement which may properly be characterized as a patentable invention. Defendants argue that the claims of Wach are directed to a simple mixture of two compounds to secure their normal and expected result, which was well within the competency of any person skilled in the art. This same argument was rejected by the District Court, as is evidenced by the following finding of fact:

> "The addition of urea to dibasic ammonium phosphate in a dentifrice produces a synergistic action, particularly in the fact that the dibasic ammonium phosphate acts immediately and the urea more slowly, or latently."

Defendants in their brief inform us, we think correctly, as to the meaning of "synergistic action." They state that it refers to "compositions containing two or more chemical compounds, particularly in the therapeutic field, that are supposed to convert an aggregation into a combination, just as a claim of 'unexpected and unobvious' results is supposed to do in the mechanical arts." They supply a definition from Webster's New International Dictionary of the English Language, Second Edition, Unabridged, Springfield, Mass., 1947, page 2259, as follows: "Synergism. 1. *Physiol.* Co-operative action of discrete agencies such that the total effect is greater than the sum of the two effects taken independently; * * *."

The record clearly refutes defendants' argument that the addition of urea by Wach to the dibasic of Kesel produced nothing more than the normal and expected result, or that the result achieved by mixture of the two chemical elements was nothing more than the totality of the results which would have been produced if the chemicals had been used separately.

In fact, defendants are in a poor position to urge that Wach's combination produced no synergistic action, in view of the representations made to the Pat-ent Office by Dr. Henschel by which he obtained allowance of his claims. On October 10, 1949, the Examiner disallowed claims submitted by Henschel on the basis that "there is no proof that the conjoint use of urea and dibasic ammonium phosphate provides a synergistic effect." In response to this action of the Examiner, Henschel stated: "That this synergistic effect is not an afterthought newly suggested as basis for patentability, but was noted and fully appreciated by the applicant has always appeared of record. In the specification he flatly reported that the use of 'diammonium hydrogen phosphate together with urea * * * is surprisingly effective. The ammonium salt constituent performs a prompt and quick inhibiting action * * * and the urea follows with a slow and enduring protective action for hours after the ammonium salt has been washed out.'" And again, in the same response Henschel stated: "Applicant thus teaches the joint use of both ingredients as well as their mutual interactivity. The utility of the combination is amply evidenced by his paper and the statistical evaluation thereof, and the synergistic action clearly appears from his specification and from actual experimental work."

Defendants suggest that they as licensees or assignees of Henschel are not bound by statements made by him to the Examiner in pursuit of his application for a patent. It may be as defendants assert, at any rate we so assume, that Dr. Henschel's representations in the Patent Office cannot now be utilized as an estoppel against them. Even so, we perceive no reason why his representations at that time should be held for naught. He was a qualified expert, perhaps the equal of any who are or have been connected with the case. His representations in the Patent Office were not only consistent with but corroborative of the position taken by Wach both in the Patent Office and in the District Court. More than that, defendant Amm-i-dent has repeatedly advertised that its dentifrice composed of dibasic ammonium phosphate and carbamide (urea) pos-

sessed a "synergistic action" in that "each increased the effectiveness of the other."

Plaintiff contends in any event that the Wach claims are valid even in the absence of proof of "synergistic action," while defendants argue to the contrary. Numerous cases are cited and discussed as bearing upon this argument. There is no occasion, however, to enter this discussion because we are of the view that the finding that "synergistic action" was shown is clearly supported.

■■ Finally we come to the issue of infringement. On this issue the District Court not only made a specific finding of infringement but also made the subsidiary finding, "The Amm-i-dent dentifrices are the equivalent of those disclosed in the Wach and Kesel patents, and this equivalence has been widely advertised by the defendants Amm-i-dent and Block." As heretofore noted, no question is raised in this court but that Amm-i-dent manufactured and sold by defendants infringes Kesel and, obviously, the decision of the District Court on that issue stands. We are concerned, therefore, only with the issue of infringement as it relates to Wach. A finding of infringement, like one of validity, is controlling unless clearly erroneous. Moreover, a finding of equivalence is a determination of fact which must be accorded the same treatment by a reviewing court. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 609–610, 70 S.Ct. 854, 94 L.Ed. 1097; Ingersoll Milling Mach. Co. v. General Motors Corp., 7 Cir., 207 F.2d 42, 46.

■ Defendants' principal contention is that Wach limits his invention to a compound containing 10% urea, while the accused product contains 13%. We agree with the District Court that the claims of Wach, read in the light of his specifications, contain no such limitation. The most that he does is to suggest that the amount of urea should not exceed 10%; otherwise, it would be difficult to mask its taste. Defendants in their attack upon the validity of the

patents in suit, in view of the prior art, attach great weight to the ingenuity of those skilled in the art, that is, members of the dental profession. In contrast, however, their defense on the infringement issue, if accepted, would well near obliterate all acumen possessed by the members of that profession. At any rate, it is not discernible that any great skill was required to increase the percent of urea which Wach disclosed as preferable. Even with such changes in percentage in defendants' product, the result was the same, achieved in the same manner, and was the equivalent of Wach.

The decree appealed from is

Affirmed.